05-10T

FILED JAN 06 '05 14:15 USBCRI

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

RECEIVED
JAN 25 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

In re:

LOUIS A. GENCARELLI, SR.,

Debtor.

Bk. No. 04-10682
(Chapter 11)

## MOTION FOR LEAVE TO APPEAL

NOW COME 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively, the "Creditors"), and hereby move the U.S. District Court for the District of Rhode Island, pursuant to 28 U.S.C. §158(a)(3) and Federal Rule of Bankruptcy Procedure 8001(b), for the entry of an Order granting each of them leave to appeal from the Order and Judgment entered by the U.S. Bankruptcy Court for the District of Rhode Island on December 29, 2004, which overruled the Creditors' Objection to, and granted Debtor Louis A. Gencarelli, Sr.'s ("Gencarelli") Motion for authority to release $2.5 million of bankruptcy estate funds to himself in order to pay tax liabilities.

In short, a substantial distribution of estate funds was allowed by the Bankuptcy Court and already made to both secured and unsecured creditors even though no Chapter 11 plan of reorganization was ever filed or confirmed. The Bankruptcy Court has also permitted two (2) interim distributions to Gencarelli in the total combined sum of $3 million. Furthermore, under the unique circumstances of this case, as previously demonstrated in Creditors' Memorandum in Support of Leave to Appeal dated November 19, 2004 (docketed with the U.S. District Court for the District of Rhode Island, C.A. No. 04-496T), Gencarelli filed his individual Chapter 11 bankruptcy petition in bad faith and is clearly abusing the bankruptcy process. Thus, the Bankruptcy Court's ruling granting Gencarelli's second Motion for an interim distribution of

2

$2.5 million constituted an abuse of discretion, and further supports the Creditors' argument that appellate review of this bankruptcy case is warranted at this time.

A Memorandum in support of this Motion is being filed contemporaneously herewith.

1500 MINERAL SPRING ASSOCIATES, LP, and
1800 SMITH STREET ASSOCIATES, LP, by and
through their General Partner JASON'S REALTY
CORP.

By their Attorneys,

Denean M. Russo

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
Dated: January 6, 2005

**CERTIFICATION**

I hereby certify that a true copy of the within Motion for Leave to Appeal was sent first class mail, postage prepaid, on this 6th day of January, 2005, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Motion for Leave to Appeal-Distribution 010405.doc

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| In re: LOUIS A. GENCARELLI, SR., Debtor. | Bk. No. 04-10682 (Chapter 11) |

**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL**

I. INTRODUCTION

Claimants, 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively, the "Creditors"), hereby submit this Memorandum in support of their Motion for the entry of an Order granting each of them leave to appeal from the Order and Judgment entered by the U.S. Bankruptcy Court for the District of Rhode Island on December 29, 2004, which overruled the Creditors' Objection to, and granted Debtor Louis A. Gencarelli, Sr.'s ("Gencarelli") Motion for authority to release $2.5 million of bankruptcy estate funds to himself in order to pay tax liabilities.

In summary, in their Objection to Gencarelli's Motion for a second interim distribution of funds to himself dated December 20, 2004 (the "Objection"), the Creditors emphasized that Gencarelli has made no good faith effort to formulate, propose and/or implement a Chapter 11 plan. Rather, the Bankruptcy Court has allowed Gencarelli to make a substantial number of piecemeal, pre-confirmation payments to both secured and unsecured creditors, and even permitted the total payment of **$3 million to Gencarelli himself**, contrary to the provisions of the United States Bankruptcy Code §§1106, 1107, 1121-1129, Bankruptcy Rule 3021, and the clear policy behind Chapter 11 reorganizations, *i.e.* successful rehabilitation after a plan is

confirmed. *See In re Swallen's, Inc.*, 269 B.R.634, 637-639 (6th Cir. B.A.P. 2001); *In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 784-787 (W.D.Pa. 1988). Thus, the Bankruptcy Court abused its discretion in denying the Creditors' Objection and in granting Gencarelli's Motion. Moreover, Gencarelli's request for and the ultimate allowance of this second interim distribution to Gencarelli in the amount of $2.5 million further demonstrates that Gencarelli was solvent and had no intention or need to reorganize or rehabilitate when he filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code and, therefore, he filed his individual petition in bad faith and is clearly abusing the bankruptcy process. Consequently, because of the unique circumstances of this case, appellate review of this bankruptcy case is necessary and should be granted at this time.

## II. THE PERTINENT FACTS AND PROCEDURAL BACKGROUND

The Creditors incorporate herein by reference all of the pertinent facts and procedural background set forth in: (a) their prior Memorandum in Support of Leave to Appeal dated November 19, 2004, a copy of which is attached hereto as Exhibit A (docketed with the U.S. District Court for the District of Rhode Island, C.A. No. 04-496T); and updated in (b) their Objection dated December 20, 2004, attached hereto as Exhibit B.

In accordance with the Bankruptcy Court's request, Gencarelli filed a Response to the Creditor's Objection dated December 23, 2004 ("Response"), a copy of which is attached hereto as Exhibit C, wherein he attempted: (1) to justify the immediate payment of the outstanding tax obligations by simply submitting an affidavit of his accountant without any supporting documentation; and (2) to minimize the potential significance of the Tim Horton's claims, which were originally revealed to the Creditors in Gencarelli's Supplement to his Second Motion dated December 15, 2004 ("Supplement") (a copy of which is attached hereto as Exhibit D), by simply

giving his unsupported opinion that those Tim Horton's claims had little or no merit. Furthermore, the calculation set forth in Gencarelli's Response failed to take into consideration the professional fees and administrative expenses that were "projected not to exceed approximately $1,750,000 in total" by Gencarelli in his Supplement. *See* Exhibit D at ¶3 and ¶4. Nevertheless, on December 29, 2004, the Bankruptcy Court entered the Order and Judgment which overruled the Creditors' Objection to, and granted Gencarelli's Motion for the release of $2.5 million of bankruptcy estate funds to himself in order to pay tax liabilities. A copy of the Order and Judgment is attached hereto as Exhibit E.

## III. ARGUMENT

The Creditors incorporate herein by reference all of their arguments set forth in: (a) their prior Memorandum in Support of Leave to Appeal dated November 19, 2004 (*see* Exhibit A); and (b) their Objection dated December 20, 2004 (*see* Exhibit B).

The Creditors recognize that appellate review of an interlocutory order "should be used sparingly and only in exceptional circumstances, and where the proposed intermediate appeal presents one or more difficult and pivotal questions of law not settled by controlling authority." *Northeast Savings, F.A. v. Geremia*, 191 B.R. 275, 278 (D.R.I. 1996) (citations omitted); *See also In re Williams*, 215 B.R. 289, 298 at n.6 (D.R.I. 1997) (permissive appeal under §158(a)(3) should be made available only in exceptional circumstances such as where "serious perhaps irreparable consequences are threatened which can be effectually challenged only by immediate appeal" (citation omitted)). This bankruptcy matter is certainly a case of **exceptional circumstances**, as explained in Exhibit A and Exhibit B hereto. Therefore, after considering the unusual and extraordinary circumstances of this bankruptcy case, when viewed and considered by the Court **in their entirety**, granting the Creditors leave to appeal is certainly warranted.

Furthermore, even though the December 29, 2004 Order entered by the Bankruptcy Court is technically an interim/interlocutory order, it is more in the nature of a "final" order in that a substantial sum of money is being disbursed to the Debtor -- $2.5 million will be going out of the estate's coffers. That money will not be recoverable by the estate at a later date, but will be permanently gone if the Creditors are forced to wait to challenge said disbursement at the close of this case. Consequently, irreparable consequences are threatened which can be effectually challenged only by immediate appeal. *In re Williams*, *supra*.

## IV. CONCLUSION

For all of the reasons set forth above, the Creditors respectfully request that the U.S. District Court for the District of Rhode Island enter an Order granting each of them leave to appeal from the Order and Judgment entered by the U.S. Bankruptcy Court for the District of Rhode Island on December 29, 2004.

Respectfully submitted,

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

Denean M. Russo

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: January 6, 2005

## CERTIFICATION

I hereby certify that a true copy of the within Memorandum was sent first class mail, postage prepaid, on this 6th day of January, 2005, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Memo in Supp of Motion for Leave to Appeal-Distribution 010405.doc

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re:<br><br>LOUIS A. GENCARELLI, SR.,<br><br>Debtor. | Bk. No. 04-10682<br>(Chapter 11) |

USBCRI

# MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL

## I. INTRODUCTION

Claimants, 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively referred to herein as the "Creditors"), hereby submit this Memorandum in support of their Motion for the entry of an Order granting each of them leave to appeal from the Order and Judgment entered by the U.S. Bankruptcy Court for the District of Rhode Island on November 10, 2004, which denied the Creditors' Motion to Dismiss the individual Chapter 11 bankruptcy petition of Debtor Louis A. Gencarelli, Sr. ("Gencarelli") on the ground of lack of good faith pursuant to 11 U.S.C. §1112(b) and §105. In said Motion to Dismiss, the Creditors established that Gencarelli was solvent and had no intention or need to reorganize or rehabilitate when he filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code (the "Code") and, therefore, Gencarelli filed his individual petition in bad faith and is clearly abusing the bankruptcy process. Consequently, the Bankruptcy Court abused its discretion in denying the Creditors' Motion to Dismiss. Thus, because of the unique circumstances of this case, as will be discussed below, leave to appeal should be granted.

FILED NOV 19 '04 10:52 USBCRI

EXHIBIT
A

## II. STATEMENT OF THE PERTINENT FACTS

Gencarelli was the President, CEO and Chairman of the Board of his family business Bess Eaton Donut Flour Company, Inc. ("Bess Eaton" or the "Business"). In addition, Gencarelli owned or leased in his individual capacity much of the commercial real estate located in various locations which was utilized in connection with the operations of Bess Eaton (the "Commercial Property"). It was common practice for Gencarelli to then lease or sub-lease the Commercial Property to Bess Eaton. Furthermore, Gencarelli had personally guaranteed the payment of certain liabilities of the Business.

The Creditors and Gencarelli entered into two long-term (*i.e.*, 20 year) commercial Absolute Triple Net Bonded Land Leases dated November 1, 1999 (collectively, the "Leases"). The Leases covered certain real property owned by the Creditors located at 1500 Mineral Spring Avenue, North Providence, and located at 1800 Smith Street, North Providence (collectively, the "Properties"). Gencarelli desired to build a Bess Eaton donut shop on each of the Properties. However, Gencarelli attempted to terminate the Leases on February 29, 2000. On or about March 28, 2000, the Creditors commenced two separate actions against Gencarelli in the Rhode Island District Court, Sixth Division, for trespass, ejectment and the payment of rent arising out of the Leases. In short, the Creditors alleged at all times that Gencarelli breached both of the Leases and that Gencarelli's purported termination of both of the Leases was ineffective. Thus, the Creditors sought recovery of the Minimum Base Rent and Additional Rent due and owing from Gencarelli as prescribed by the terms of the Leases, together with reasonable attorneys' fees and expenses.

In response to the actions commenced by the Creditors, Gencarelli filed a Complaint for Declaratory Judgment in the Providence County Superior Court on or about April 5, 2000 (C.A.

No. 00-1732), seeking a declaration of the rights and obligations of the parties under the Leases (the "DJ Action").

After a trial conducted on May 23, 2000, the Rhode Island District Court (Pirraglia, J.), rendered a decision in favor of each of the Creditors. Judgments were subsequently entered by the District Court on June 15, 2000. Thereafter, on June 16, 2000, Gencarelli filed his Notices of Appeal from those Judgments to the Providence County Superior Court. By Order entered in the Superior Court on July 25, 2000, Gencarelli's DJ Action (C.A. No. 00-1732) was consolidated with the two appeals from the Judgments of the Rhode Island District Court (C.A. Nos. 00-3174 and 00-3175).

Over several days in December 2003, the consolidated actions were tried before the Superior Court (Indeglia, J.) sitting without a jury. In addition, pursuant to the trial justice's request, counsel for the Creditors and counsel for Gengarelli each prepared and filed lengthy and detailed Proposed Findings of Fact and Conclusions of Law, and a Post-Trial Memorandum on February 9, 2004. Post-trial oral argument was scheduled for hearing on March 3, 2004 at 2:00 p.m.

On February 27, 2004, Tim Horton's (New England) Inc., ("Hortons") entered into an Asset Purchase Agreement ("Agreement") with Gencarelli and Bess Eaton for the sale of substantially all of Bess Eaton's assets. As a condition of the purchase of the Business assets, Horton's required Gencarelli to file a voluntary Chapter 11 bankruptcy petition on behalf of the Bess Eaton and in his individual capacity. On February 27, 2004, Gencarelli also signed a guaranty in which he, *inter alia*, guaranteed payment in full to the Business' unsecured creditors whose claims were allowed in the Chapter 11 case (the "Guaranty"). Shortly after signing the Agreement and Guaranty, a voluntary Chapter 11 bankruptcy petition was filed by Bess Eaton on

March 1, 2004. A few days later, on the afternoon of March 3, 2004, Gencarelli filed his individual voluntary Chapter 11 bankruptcy petition with the Bankruptcy Court. The schedules filed in support of Gencarelli's individual Chapter 11 bankruptcy petition reflect that Gencarelli's assets were valued at approximately $30,788,278.80, and his liabilities were valued at approximately $30,428,937.48. Thus, the schedules demonstrate that he was solvent at the time of his initial filing on March 3, 2004.

On March 3, 2004, prior to the filing of Gencarelli's Voluntary Bankruptcy Petition, Justice Indeglia of the Superior Court heard post-trial oral argument from both counsel in the consolidated state court actions and took the matters under advisement. Gencarelli's Bankruptcy Petition was filed after the parties had concluded all activity concerning the proceedings in the Superior Court and after the matters were taken under advisement by the trial justice. Thereafter, Justice Indeglia filed his written Decision in favor of the Creditors and against Gencarelli on March 26, 2004.[1] A copy of the Superior Court Decision is attached hereto as Exhibit A.

On April 5, 2004, the Creditors moved for relief from the automatic stay imposed by 11 U.S.C. §362(a) for "cause" under §362(d)(1) to allow the Providence County Superior Court to enter final Judgments in the consolidated state court actions. Pursuant to a Consent Order executed by counsel for the Creditors and bankruptcy counsel for Gencarelli, and entered by the Bankruptcy Court on June 15, 2004, relief from the automatic stay was granted. Thereafter, Justice Indeglia of the Superior Court entered Judgments in favor of the Creditors on June 24, 2004. A copy of the Superior Court Judgments are attached hereto as Exhibit B.

---

[1] *See, e.g., In re Wilson*, 72 B.R. 956, 958 (Bankr.M.D.Fla. 1987), citing and discussing *In re Anderson*, 62 B.R. 448, 452-53 (Bankr.D.Minn. 1986) ("**Where parties to a proceeding have concluded all activity and the court** makes an oral ruling or **takes the matter under advisement prepetition,** the entry of a decision post-petition by the court is not an action which is stayed under §362(a). This situation is significantly different than if one of the parties tries to enforce the decision after it is entered

On April 15, 2004, each of the Creditors filed their respective Proof of Claim with the Bankruptcy Court. The amount of each claim consisted of two components: (a) the proposed amount of the final Judgment to be entered in the state court action consistent with Justice Indeglia's written Decision dated March 26, 2004; and (b) the estimated amount of the contingent future rent and "additional rent" under the subject lease, plus additional interest, attorneys' fees and expenses that would continue to accrue on the claim from and after March 31, 2004. Thus, Mineral Spring's claim was for: (a) Judgment amount of $314,059.78; and (b) $153,667.80 for future rent and "additional rent," plus all interest (including post-judgment interest), attorneys' fees and expenses that would continue to accrue on Mineral Spring's claim. Likewise, Smith Street's claim was for: (a) Judgment amount of $257,288.02; and (b) $118,969.26 for future rent and "additional rent," plus all interest (including post-judgment interest), attorneys' fees and expenses that would continue to accrue on Smith Street's claim.

The Bankruptcy Court approved the sale of the Business assets and the Commercial Property under §363 of the Code, and authorized the payment of certain secured claims from the sale proceeds at the closing with Hortons. On or about April 23, 2004, a subsequent Order was entered by the Bankruptcy Court pursuant to which a substantial number of remaining creditors were to be paid. The Business was ultimately sold to Horton's for significant sums ($41,600,000) on or about May 4, 2004. Thereafter, the Commercial Property was sold for a few million dollars, which funds were commingled with the proceeds from the sale of the Business assets. Thereafter, additional claims were paid by the Debtors' bankruptcy estate.

On or about August 13, 2004, Gencarelli filed a Motion to Limit the Allowance of the Claims of the Creditors pursuant to 11 U.S.C. §502(b)(6), which was ultimately granted by the

---

post-petition, or takes some other type of affirmative action without first seeking relief from §362(a)." (emphasis added)).

Bankruptcy Court during a hearing thereon on September 22, 2004, over the objection of the Creditors. The Creditors believe that the Bankruptcy Court's decision was erroneous. As of this date, however, no Order has been entered by the Bankruptcy Court. Therefore, the Creditors have not yet been able to file their appeal from the Bankruptcy Court's decision on the §502(b)(6) limitation/cap issue.

On November 2, 2004, the Creditors filed a Motion To Dismiss Gencarelli's Individual Bankruptcy Petition For Lack Of Good Faith pursuant to 11 U.S.C. §1112(b) and §105.[2] In their supporting Memorandum, a copy of which is attached hereto as Exhibit C, the Creditors assert that Gencarelli filed his individual petition in bad faith, while he was solvent and with no rehabilitative intent or need. Furthermore, Gencarelli's only intent in filing for bankruptcy was to effectuate the sale of Bess Eaton's assets to Hortons on more favorable terms -- free and clear of liens, claims and encumbrances. Therefore, Gencarelli lacked a legitimate rehabilitative purpose. Nevertheless, during a hearing held the next day on November 3, 2004, the Bankruptcy Court summarily denied the Creditors' Motion to Dismiss without requiring a responsive pleading from Gencarelli and without making any findings of fact. The Order and Judgment denying the Creditors' Motion to Dismiss were entered by the U.S. Bankruptcy Court for the District of Rhode Island on November 10, 2004. A copy of the Bankruptcy Court Order and the Judgment are attached hereto as Exhibit D.

In summary, as of this date, the substantial amount of proceeds derived from the sale of Bess Eaton and the Commercial Property have **paid in full almost all** of the secured and

---

[2] A petitioner lacks good faith when it has no need to rehabilitate or reorganize, and the petition cannot serve the rehabilitative purpose of Chapter 11. In re Liberate Technologies, 2004 Bankr. N.D. Cal. LEXIS 1339 at *7; In re SGL Carbon Corp., 200 F.3d 154, 166 (3rd Cir. 1999). "Chapter 11...enable[s] a debtor to continue to operate and to reorganize its business rather than simply to liquidate" its business. 7 Collier on Bankruptcy 1100.01 (15th Revised Edition). *See* Exhibit C attached hereto.

unsecured claims of both Bess Eaton and Gencarelli. Thus, there will be no need for a plan of reorganization. In addition, Gencarelli intends to assume his lease with Porsche Financial Services (claim for $68,900). Thus, only a few creditors remain. In the end, if the Creditors are not granted leave to appeal, the Creditors' claims will be the only claims adversely affected by Gencarelli's bankruptcy filing and only because of the unique Bankruptcy Code provision pertaining to the "cap" on commercial leases.[3] On the other hand, Gencarelli will emerge from bankruptcy driving away in his Porsche after receiving a large distribution of surplus/excess funds from the bankruptcy estate to the tune of several million dollars to line his pockets. Without a doubt, Gencarelli manipulated and abused the bankruptcy process to effectuate the sale of his Business to Hortons and obtain a better bargain. Clearly, this unique situation cannot be consonant with the purpose of the Bankruptcy Code, *i.e.* rehabilitation. Under the totality of the circumstances in this matter, Gencarelli had no need to rehabilitate or reorganize and, therefore, his bankruptcy petition was filed in bad faith. Consequently, the Bankruptcy Court abused its discretion in denying the Creditor's Motion to Dismiss, and leave to appeal should be granted under the exceptional circumstances of this case.

## III. ARGUMENT

The District Court has discretionary jurisdiction over interlocutory orders and decrees of the Bankruptcy Court pursuant to 28 U.S.C. §158(a)(3). However, neither the statutes nor the rules governing such appeals provide express criteria or standards to guide the District Court in determining whether to exercise its discretionary power to grant leave to appeal. As a result, the District Court for the District of Rhode Island, like most courts, has applied the factors considered under 28 U.S.C. §1292(b), which governs interlocutory appeals from the district

[3] Note that had Gencarelli utilized the state court receivership laws and procedure to sell his Business to Hortons instead of filing for bankruptcy, no statutory "cap" would apply to the Creditors' claims.

courts to the circuit courts of appeal. *In re Watson,* 309 B.R. 652, 659-660 (1st Cir. BAP (R.I.) 2004); *In re Williams*, 215 B.R. 289, 298 at n.6 (D.R.I. 1997); *Northeast Savings, F.A. v. Geremia,* 191 B.R. 275, 277 (D.R.I. 1996). Under that standard, appellate review of an interlocutory order is appropriate where the order concerns "a controlling question of law as to which there is substantial ground for difference of opinion," and the immediate resolution of the controlling question of law will "materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(b). *See also In re Watson*, *supra; Northeast Savings*, *supra*; *In re Jackson*, 190 B.R.808, 810 (W.D.Va. 1995) (District Court granted a creditor leave to appeal from an interlocutory order denying its motion to dismiss based upon the finding that the appeal will materially advance the termination of the litigation). The District Court for the District of Rhode Island has noted, however, that while the analogy to the §1292(b) standard is useful, it is not perfect. Therefore, utilization of that standard in determining whether to hear a permissive appeal under §158(a)(3) is "jurisprudential and not jurisdictional." *In re Williams*, *supra*. Furthermore, interlocutory certification under the §1292(b) standard "should be used sparingly and only in exceptional circumstances, and where the proposed intermediate appeal presents one or more difficult and pivotal questions of law not settled by controlling authority." *Northeast Savings*, 191 B.R. at 278 (citations omitted); *See also In re Williams*, *supra* (permissive appeal under §158(a)(3) should be made available only in exceptional circumstances such as where "serious perhaps irreparable consequences are threatened which can be effectually challenged only by immediate appeal" (citation omitted)). Consequently, §158(a)(3) provides the District Court with broader jurisdictional discretion to review an interlocutory appeal, even though it would not be considered final for purposes of appeal in other instances, in circumstances where the denial of the appeal would have an irreparable effect on the rights of the appellant.

This bankruptcy matter is certainly a case of **exceptional circumstances**, as explained above and in Exhibit C hereto, which is incorporated herein by reference. In fact, after a diligent search of numerous "debtor's good faith filing" cases, the Creditors have been unable to find one case from any jurisdiction with the same unjust circumstances as are present in this matter (*i.e.*, a solvent debtor voluntarily files a Chapter 11 bankruptcy petition with the intention to use the bankruptcy process to sell his business; each and every secured and unsecured creditor, except the two judgment Creditors, gets paid in full from the sale proceeds; the judgment Creditors who did not get the full amount of their claims were statutorily "capped" as a result of a unique bankruptcy code provision pertaining to commercial leases and not because of insufficient estate funds; the debtor emerges from bankruptcy driving away a Porsche and carrying all of the excess/surplus bankruptcy estate funds, including those funds taken away from the judgment Creditors, totaling several millions of dollars. Query: Is that the equitable outcome the Bankruptcy Code was designed to accomplish?

In addition to being a rare, exceptional case warranting appellate review, the Creditors can meet the standards necessary for an interlocutory appeal. First, whether Gencarelli's bankruptcy case should be dismissed under 11 U.S.C. §1112(b) and §105 because he filed his petition in bad faith and is abusing the bankruptcy process is a pivotal and controlling issue in this case. On one hand, if the District Court prohibits appellate review of the Order and Judgment denying dismissal, the Creditors will face the possibility of irreparably losing an important right -- the right to collect the full amount of their state court Judgments from Gencarelli. Rather, the Creditors will be forced to collect those Judgments within the confines of the Bankruptcy Code. As a result, their claims may be substantially reduced only because of the unique provisions of 11 U.S.C. §502(b)(6). Under that scenario, the Creditors' claims will be the

only claims detrimentally affected by Gencarelli's bankruptcy filing, even though there are sufficient estate funds to pay their claims in full. More importantly, the effect of applying the bankruptcy "cap" to the Creditors' claims will only benefit Gencarelli personally. It is undisputed that all of the other secured and unsecured creditors of Gencarelli and Bess Eaton have been or will be **paid in full.** Thus, all of the funds taken away from the Creditors will be added into the pot of surplus/excess estate funds that will ultimately go into the hands of Gencarelli.

On the other hand, if the District Court grants leave to appeal and the Bankruptcy Court's ruling on the Creditors' Motion to Dismiss is reversed, then the bankruptcy proceeding will be terminated and the surplus/excess sales proceeds currently being held in an escrow account will be distributed to Gencarelli. None of the remaining creditors will be prejudiced by the dismissal. The few creditors remaining in this matter will be allowed to assert their rights and pursue their claims against Gencarelli outside of the bankruptcy context, as they would have been able to do *status quo ante*. In that instance, no creditor will have to give up a valuable right and the Creditors will be allowed to pursue Gencarelli to collect the entire amount of their state court Judgments.

Second, as explained above, this appeal presents a difficult and pivotal question of "bad faith filing" that, under the extraordinary circumstances of this case, has not been settled by controlling authority. There is substantial ground for difference of opinion in that no other jurisdiction has addressed this 11 U.S.C. §1112(b) dismissal issue where the same unique circumstances were present. Therefore, resolution of this dismissal issue by the District Court will establish case precedent and have a significant impact in this and other jurisdictions.

Third, the immediate resolution of this dismissal issue in the Creditor's favor will terminate and dispose of the bankruptcy proceeding. Thus, the interlocutory appeal will greatly assist and materially advance the termination of the underlying bankruptcy matter.

## IV. CONCLUSION

For all of the reasons set forth above, the Creditors respectfully request that the U.S. District Court for the District of Rhode Island enter an Order granting each of them leave to appeal from the Order and Judgment entered by the U.S. Bankruptcy Court for the District of Rhode Island on November 10, 2004.

Respectfully submitted,

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

Robert D. Wieck /DMR
Denean M. Russo

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: November 19 2004

**CERTIFICATION**

I hereby certify that a true copy of the within Memorandum was sent first class mail, postage prepaid, on this 19th day of November, 2004, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Connecticut Department of Revenue
C and E Division, Bankruptcy Section
25 Sigourney Street
Hartford, CT 06106-5032

Charles S. Sokoloff Incorporated
Eleven Thurber Boulevard
Smithfield, RI 02917

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Porsche Financial Services
4343 Commerce Court, Suite 300
Lisle, IL 60532

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Memo in Supp of Motion for Leave to Appeal 111704.doc

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

**PROVIDENCE, SC.** **SUPERIOR COURT**

**1500 MINERAL SPRING ASSOCIATES, LP,**
**1800 SMITH STREET ASSOCIATES, LP,**
**AND JASON'S REALTY CORP.**

**PLAINTIFF**

**C.A. Nos: 00-1732, 00-3174, 00-3175**

*vs.*

**LOUIS A. GENCARELLI, SR.**

**DEFENDANT**

## DECISION

INDEGLIA, J.: This matter is before the Court on Plaintiffs' actions for rent and associated expenses on two leases with lessee Defendant and on Defendant's Complaint for Declaratory Judgment seeking a declaration of rights and obligations of the parties under the leases.[1] Over several days in December 2003, this matter was tried before this Court sitting without a jury. The parties have submitted post trial briefs and made oral arguments in support of their respective positions.

## FACTS AND TRAVEL

This dispute arises from two commercial leases that were executed as of November of 1999, between Plaintiffs 1500 Mineral Spring Associates, LP (hereinafter "MSA" or "Plaintiff"), and 1800 Smith Street Associates, LP (hereinafter "SSA" or

EXHIBIT
A

"Plaintiff"), and Defendant Louis A. Gencarelli Sr. (hereinafter "Gencarelli", "Defendant", or "Lessee"). Bennie Sisto (hereinafter "Sisto", "Plaintiff", or "Lessor") is the President and majority stockholder of JASON'S REALTY CORP., the general partner of both MSA and SSA. At all times relevant hereto, Gencarelli had been President, CEO and Chairman of the Board of Bess Eaton Donut Flour Company.[2]

Negotiations between Sisto and Gencarelli began in 1998 when Sandra Salvadore (hereinafter "Salvadore"), the real estate broker for MSA and SSA, presented the subject properties to Tim Londregan (hereinafter "Londregan") of Londregan Real Estate, who then represented Bess Eaton. At that time, Londregan informed Salvadore that Bess Eaton was interested in both sites but could not act immediately. In February 1999, Salvadore once again contacted Londregan at which time Londregan proceeded to bring the subject properties to Gencarelli's attention. Gencarelli personally visited both sites with Salvadore, Sisto, Jason Sisto (Plaintiff's son) and Londregan.

In June 1999, Salvadore contacted Gencarelli and his attorney, Scott Spear, to discuss the properties, at which time Salvadore was informed that Gencarelli was now ready to proceed. Thereafter, the parties exchanged several draft letters with respect to each of the properties. In July of 1999, Salvadore forwarded site maps of both MSA and SSA to Bess Eaton. Peter Huff (hereinafter "Huff"), who was Bess Eaton's Director/Manager of Construction and Architectural Design at that time, was to review the identified Bess Eaton locations/sites and work with the contractors, engineers and attorneys that were necessary to complete the projects. On July 8, 1999, Huff prepared a

[1] The Plaintiffs actions are de novo appeals from the District Court which awarded judgment for Plaintiffs.
[2] It should be noted that in 2002, Defendant Gencarelli did not act as president of Bess Eaton. During 2002, the president of Bess Eaton was George Cioe. After 2002, Gencarelli resumed his position as president of Bess Eaton.

preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on MSA and forwarded it to Salvadore and Gencarelli. On July 19, 1999, Huff prepared a preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on SSA and forwarded it to Salvadore. From September 7, 1999, through the latter part of 1999, the parties negotiated and exchanged draft leases regarding the subject properties.

On November 1, 1999, Defendant entered into two five-year leases for MSA and SSA.[3] The Defendant intended to build and operate two Bess Eaton facilities on those sites, and both leases contained a number of identical conditions precedent that were to be satisfied by Defendant and by Plaintiff. The last paragraph of paragraph 1(a) in both leases, and paragraph 1(b) and 1(c) of both leases are identical, and provide as follows:

> "a. It shall be a condition precedent to the Lessee's [Gencarelli's] performance of any obligation Lessee may have as Lessee hereunder that: (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution

[3] The rent provisions in the leases state they are applicable for the "first five-year period, commencing on March 1, 2000."

of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.

> b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.
>
> c. The Additional Rent Commencement Date shall be November 1, 1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void."

Additionally, the first sentence of paragraph 1(a) of the 1500 Lease also provides:

> "This lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs."

The 1500 lease provided for a minimum base rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 lease provided for a minimum base rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

On November 4, 1999, two cover letters were delivered to MSA and SSA from Defendant, each stating the following:

> "Upon final review of the Agreement [Leases], I gave consideration to the possibility that I may encounter delays in the process of obtaining permits. In the event that I experience delays, court contests or appeals, I will need

> your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date."

In response, both MSA and SSA executed their respective cover letter acknowledging that:

> "The content of this letter is acceptable on behalf of [1800 Smith Street Associates, LP or 1500 Mineral Spring Associates, LP as appropriate] and shall be deemed an amendment to the above referenced Land Lease."

Between November 1, 1999 and February 29, ~~1999,~~ 2000 the parties exchanged several letters and corresponded through their respective agents, primarily Huff and Salvadore. The most pertinent of those communications are discussed herein. On December 20, 1999, Salvadore informed Gencarelli that Garafalo had been hired to perform the environmental reports for both Smith Street and Mineral Spring Avenue. Gencarelli acknowledged his acceptance thereof by executing each letter agreement at the bottom after the following language: "The content of this letter is acceptable on behalf of Bess Eaton Coffee & Bake Shop and shall be deemed an amendment to the above referenced Absolute Triple Net Bonded Land Lease." Sisto testified that he believed that Gencarelli's acknowledgement on and acceptance of the December 20, 1999 letter agreements meant that he was not going to enforce the 60 day deadline for delivery of the environmental reports.

During the trial, Salvadore testified that in December 1999 or January 2000, she contacted Huff to inquire as to Gencarelli's commitment on the Mineral Spring Avenue site and Huff responded that they were totally committed and to move forward with whatever needed to be done to get the site ready. Additionally, Sisto testified that in December 1999, he also had a conversation with Huff wherein Huff told him that they

were going forward with the deal and that they did not want to utilize the existing structures on Mineral Spring. Sisto further testified that in reliance on the above-stated conversations with Huff, in January 2000, MSA demolished and removed the existing brick buildings/ structures from the Mineral Spring Avenue property, and re-graded the site for construction.

On February 14, 2000, Salvadore met with two engineers from Garofalo at the Mineral Spring Avenue site, who were performing the Phase I site evaluation. At this time, Garofalo recommended that a Phase II subsurface investigation be performed on Mineral Spring Avenue because it was discovered that a gas station previously located on another piece of property upgrade from the Mineral Spring Avenue site had a leaking underground storage tank. During the trial, Salvadore testified that she telephoned Huff to inform him of the Phase II evaluation being performed and to ask Huff whether he wanted a written copy of the completed Phase I report. According to Salvadore, Huff told her "no" and to just go ahead with the Phase II evaluation. On February 24, 2000, the Phase II evaluation was being conducted. Salvadore testified that while she was at the Smith Street site, she telephoned Huff to inform him that Phase II was being performed on both properties that day and Huff expressed his pleasure with the progress. Salvadore's recollection of her telephone conversations with Huff is consistent with Gencarelli's testimony during trial in which he stated that receiving the written environmental reports on Mineral Spring Avenue and Smith Street within the 60 day time period set forth in the leases was not important to him.

Also, in February of 2000, the parties resumed correspondence relating to the obtaining of the necessary permits and approvals. By correspondence dated February 16,

2000, corporate counsel for Gencarelli/Bess Eaton, Scott Spear, told Salvadore to contact Attorney Ferrucci, who was engaged by Gencarelli to provide legal services with respect to the permitting process, and work directly with him on the permitting aspects of the projects. On February 17, 2000, Salvadore advised Huff, Attorney Spear and Attorney Ferrucci that the North Providence Town Planning Board Director had reserved two spots for the Smith Street and Mineral Spring Avenue proposals on the Planning Board's February 22 meeting Agenda, and that Bess Eaton needed to submit "something" to him. In response, Huff put together informational packages for each site, which were ultimately submitted to the Planning Board at its February 22, 2000 meeting. The sketch contained in the Smith Street package was the same sketch that was previously prepared by Huff on July 19, 1999 during negotiations between the parties. Likewise, the sketch contained in the Mineral Spring Avenue package is the same sketch that was previously prepared by Huff on July 8, 1999, during negotiations.

At the Planning Board's February 22 meeting, Huff made his presentation regarding each of the projects. The Planning Board took no formal action at this time because there was not a quorum present at that meeting. The matters were continued to the next meeting of the Planning Board, to be held on March 13, 2000. During the trial, Gencarelli testified that he was informed that the Planning Board reacted favorably to the projects, even though they could not take action.

Shortly before the end of the 120-day period set forth in the leases, Sisto sent invoices to lessee for each property, reminding Gencarelli of the rent commencement date and charging rent on each lease as of February 29, 2000. On February 29, 2000, Termination Notices were sent from Gencarelli to SSA and MSA that purported to

exercise Gencarelli's right to terminate the 1500 lease and the 1800 lease. Gencarelli bases his right of termination on the fact that all conditions precedent referenced in the leases were not accomplished within the 120 day time frame set forth in the leases.

## PLAINTIFF'S ARGUMENT

The Plaintiff-lessor contends that the letters exchanged between the parties constituted a modification to each of the leases, evidencing the parties' intent not to be bound by a strict adherence to the 120 day period set forth in paragraph 1 of the leases. Lessor argues that the amendments to the leases clearly demonstrate that time was not of the essence and therefore, the lessee was not justified in terminating the leases because all of the conditions in the leases were not performed within the original 120 day time period. Furthermore, lessor asserts that even if Defendant did not expressly waive all of the time provisions set forth in the leases, Defendant's behavior up until his letter terminating the leases, was indicative of someone who intended to be bound by the leases and was satisfied with the progress being made.

While lessor concedes that he sent a bill for the base rent due 121 days after execution of the leases, lessor asserts that the bill for rent was a separate act that was not dependent upon the 120 day time period set forth in the leases, as these time limits had already been waived by the parties. Lessor maintains that even if the 120 day time period was not expressly waived by the amendments to the leases, lessee's actions manifested an implicit waiver of the 120 day time constraint in the leases. Consequently, the bill sent by lessor with regard to the properties in question was an independent act that did not carry with it any meaning other than to notify the lessee that the due date for the

minimum base rent was upon them. Additionally, lessor posits that he would have been willing to adjust the due date for the minimum base rent had the lessee opted to engage in discussions with the lessor regarding this matter. It is lessor's contention that up until the point that lessee informed lessor that he was terminating the leases, negotiations between the parties were extremely amiable and making additional accommodations had never posed a problem.

Furthermore, lessor argues that lessee should be held responsible for the rent on the lease because he did not fulfill his duty to use good faith, diligence and best efforts to obtain the necessary approval and permits within the 120 day time period. Lessor maintains that the provision allotting the lessee 120 days to secure financing before either party could terminate the lease assumed that the lessee would make reasonable efforts to secure said financing. Thus, even if the 120 day time period had not been waived by the parties, lessor contends that lessee would still be obligated to pay the rent on the leases, as the lessee did not even attempt to fulfill the condition pertaining to the 120 day time constraint.

Finally, lessor maintains that lessee should bear the costs incurred as a result of the demolition of the structures on the Mineral Spring Avenue site. Lessor argues that he reasonably relied on the representations of lessee and Huff that lessee had every intention of going forward with the leases, irrespective of any time frames originally set forth in the leases.

## DEFENDANT'S ARGUMENT

Conversely, Defendant-lessee argues that when the conditions precedent were not accomplished within the 120 day time period set forth in the leases, the lessee's obligations to pay rent automatically ceased, and both leases became null and void. It is lessee's contention that the 120 day time period allotted in the leases was a strict time limit within which all of the conditions precedent set forth in the leases needed to be performed. Lessee asserts that because he was unable to obtain financing within 120 days following execution of the leases, under the terms of the agreements, his obligations under the leases automatically ceased. While the lessee does not contest that he was obligated to make reasonable efforts to obtain financing within the 120 days, as per the agreements, he maintains that the lessor's failure to perform certain contingencies, namely providing environmental assessments and boundary surveys in a timely manner, prevented him from obtaining financing within 120 days of execution of the leases, the nonoccurrence of which voided the agreements.

Moreover, lessee maintains that the lessor's bill for the base rent on the 121st day after execution of the leases undermines the lessor's position that the 120 day time provision in the leases was waived or modified by the parties. Lessee contends that if the lessor truly believed that the parties were no longer bound by the 120 day time period then lessor would not have sent out a bill for the rent exactly 120 days after execution of the leases, as provided for in § § b and c of the leases. It is lessee's position that the lessor's partial adherence to the aforementioned provisions, subsequent to the passage of the 120 day time period set forth in the leases, is demonstrative of the fact that lessor

intended to be bound by these provisions, regardless of any amendments made to the 60 day time period allotted for environmental assessments and boundary surveys.

Furthermore, it is lessee's contention that he should not be held responsible for the costs incurred due to the demolition of the structures on Mineral Spring Avenue because lessor was aware that under the terms of the lease, lessee's obligations on the leases would only be triggered if all conditions precedent were accomplished within the 120 day time frame set forth in the leases.

## DISCUSSION

The Rhode Island Supreme Court has repeatedly held that contracts which include provisions relating to performance at a fixed time are to be given a reasonable construction by the court, with regard being given to the surrounding circumstances and the parties' manifested intent. Safeway System, Inc. v. Manuel Bros., Inc., 228 A.2d 851, 856 (R.I. 1967); Furlong v. Barnes, 8 R.I. 226 (R.I. 1865). "A contract is not to be construed like a railway time-table." Furlong, 8 R.I. at 229. Additionally, when construing a contract that includes a provision relating to time limits, the burden of proof falls upon the party contending that time is of the essence. Sal's Furniture Co. v. Peterson, 133 A.2d 770, 773 (R.I. 1957).

In the present case, lessee has not demonstrated to this Court that time was of the essence in the lease agreements at issue. Although the leases do give a specific time frame for the completion of certain conditions, there is no explicit language in the leases themselves suggesting that these time frames are material or essential to the agreements. Moreover, the amendments to the leases, in which the lessee himself requested leniency

if he needed additional time to obtain permits and approvals, further suggests that the parties did not view the time element to be strict in nature.

This Court rejects lessee's position that language stating that the leases shall become null and void if the terms of the leases are not satisfied possess equivalent or even stronger meaning than the phrase "time is of the essence" because they signify an automatic nullification of the leases if the conditions do not occur within the 120 day time frame. Most contracts contain language that the contract will become null and void if the parties do not act consistently with the terms of the lease. That in itself however, does not suggest that time is of the essence. "That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made. There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." Sal's Furniture Co., 133 A.2d at 773.

Moreover, lessee's argument completely ignores the fact that he implicitly waived all time limits in the leases by voluntarily continuing with the contracts long after the 60 day time limit had not been met. "'A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive." Fairbanks, Morse & Co. v. Nelson, 217 F. 218 (9th Cir. 1914). In the case of Welsh v. Dick, 84 A. 769 (Pa. 1912), the court declared: "The right to insist upon time as the essence of a contract may be waived as effectually by implication as by express agreement, and whether there has been an

implied waiver in any case depends upon whether the conduct of the party seeking to invoke the strict provision of the contract had been such as to lead the other party to believe he would not be held to it, but might, notwithstanding it, proceed to perform." Although, lessee attempts to distinguish the 60 day time limit from the 120 day time limit by arguing that the 120 day time limit was more absolute, the facts of this case do not indicate that lessee made any such representations to that effect at any time throughout the parties' transactions.

Furthermore, "it is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring out that happening." Bradford Dyeing Associates, Inc. v. J. Stog Tech GmbH., 765 A.2d 1226, 1237-38 (R.I. 2001)(citing United States v. Croft-Mullins Electric Co., 333 F.2d 772, 775 n. 4 (5th Cir. 1964)) (quoting Gulf, Mobile& Ohio Railroad Co. v. Illinois Central Railroad Co., 128 F. Supp. 311. 324 (N.D. Ala. 1954)). In the present case, lessee made no attempts to secure financing for the properties within 120 days after execution of the leases. This Court rejects lessee's argument that he was prevented from fulfilling this condition due to the lessor's failure to provide environmental assessment reports and boundary surveys in a timely manner. If it truly was lessee's intent to be lenient with regard to the 60 day time constraint while enforcing a strict 120 day time limit, then it was the lessee's responsibility to clarify this when he realized that the lessor was not going to provide the necessary documents which would allow lessee to secure financing within the 120 days initially allotted. Rather than

making lessor aware of the fact that "time was of the essence", a term absent from the lease itself, however, lessee's behavior suggested that the original time constraints in the leases were unimportant. It is clear to this Court, that lessee knew well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

In a recent case with facts very similar to the facts before this Court, the Rhode Island Supreme Court affirmed the trial court's finding that where conditions are made part of a contract, it is assumed that the parties to the contract will utilize good faith and due diligence in order to accomplish those conditions. See Ray LaCroix v. David F. Walker, 819 A.2d 1244 (R.I. 2003). This is especially true where the conditions in a contract particularly benefit or shield one party, as it is mutually assumed that the party for whom the condition is intended to protect will be using his best efforts to accomplish those conditions. See Safeway System, Inc., 228 A.2d at 853. In LaCroix, the parties entered into a five-year lease for three units in a building with the express purpose of operating a gym in the space leased. LaCroix, 819 A.2d at 1245. The lease included an express condition precedent which made the terms of the lease contingent upon the lessee's being able to obtain a license to operate a gym in the leased facility. Id. When the lessee and his architect could not reach an agreement regarding the removal of unit partitions, however, the lessee never applied for a license to operate the gym. Id. The Supreme Court declared that it was reasonable for the trial justice to conclude that the lessee breached the contract by failing to take "all necessary steps" to obtain a license, where the term "all necessary steps" meant that lessee was required to "at a minimum, submit a floor plan and apply to Gold's Gym for a license." Id. at 1246-47.

Lessee attempts to distinguish the facts in LaCroix from the facts in this case by arguing that in this case the conditions lessee had to fulfill were contingent upon the lessor's completion of its conditions. This argument does not have merit since the lessee implicitly waived the time limit for completion of the environmental assessments and boundary surveys and continuously acted in a manner that would lead a reasonable person to believe that he was not concerned with when those acts were to be performed. Here, lessee not only gave no indication to lessor that the 120 day time frame was still in effect, lessee also turned down the opportunity to secure financing when it presented itself.[4] Thus, it is apparent to this Court that lessee failed to use his best efforts in order to achieve the conditions within the 120 day time frame he depends on for nullification of the leases.

Additionally, lessee testified at trial that he was displeased when he realized that under the terms of the leases he was obligated to begin paying rent on the properties themselves before he had obtained all of the necessary permits and approvals from the Town of North Providence to build the donut shops. There is little question that Defendant viewed the parties' failure to adhere to the original terms of the agreements as an opportunity to terminate the leases and escape from what he viewed to be two disadvantageous commitments. During Defendant's deposition, Defendant conceded that he did not realize when he entered into the leases that under their terms he would potentially have to begin paying rent on the properties before he had obtained permits for

[4] In January 2000, Salvadore, Gencarelli and his son, Paul Gencarelli, met with a representative of NE Realty Resources, Inc., a financing source, at Bess Eaton in Westerly. NE Realty ultimately proposed financing to Bess Eaton to fund several of its projects, including the Smith Street and Mineral Spring projects, which had been discussed at their meeting. By correspondence to NE Realty dated January 31, 2000, Gencarelli declined the financing proposal stating "we have already secured sufficient financing to complete our development objectives for the next twelve months." This correspondence between

the Bess Eaton facilities. However, Defendant's displeasure with the agreements he made, no matter how disadvantageous, did not absolve him of his duty to act in good faith and to use his best efforts to timely obtain the permits and approvals in order to satisfy the conditions in the leases. See Bradford Dyeing Associates, Inc., 765 A.2d at 1238.

Although lessee had numerous opportunities to inform the lessor of his intent to disengage himself from the leases if all conditions were not accomplished by the 120 day mark, lessee and Huff engaged in several acts that were directly contrary to that intent. As of February 16, 2000, lessee's legal counsel had not yet filed the pertinent applications with the Town of North Providence and it was only due to the initiative of lessor and his real estate agent that the projects were placed on the agenda for the February 22, 2000 meeting for the North Providence Planning Board. That meeting was held only seven days preceding the 120 day deadline, yet none of the actions taken by lessee or those acting on his behalf indicated that there was any intent on the part of lessee to terminate the leases if all the conditions in the leases were not satisfied by the 120 day mark. At no time before, during or after this meeting, did either Huff or Ferrucci approach Sisto and inform Sisto of any urgency in obtaining approval for the permits and applications because the 120 day deadline was approaching. Lessee's complete failure to notify lessor of his intent to act in accordance with the 120 day time frame set forth in the leases when it was clear that the parties were not acting under that assumption for quite some time, served as an implicit waiver of the 120 day deadline. A contract deadline

---

Gencarelli and NE Realty evidences the fact that Gencarelli was not in a rush to secure financing within the 120 day time frame and that he was aware that he would be able to secure financing for these two projects.

may be expressly or impliedly waived by acts, words or conduct inconsistent with the deadline. CBS, Inc. v. Merrick, 716 F.2d 1292, 1295 (9th Cir. 1983)

With respect to the demolition costs incurred by lessor from the work done on the Mineral Spring Avenue site, this Court finds that lessor reasonably relied on Huff's statements in December 1999, that Defendant intended to follow though on the leases and wanted the structures on the Mineral Spring Avenue property taken down. At no time did lessee or Huff inform lessor that lessee did not intend to pay the expenses incurred as a result of this demolition if all conditions precedent were not accomplished within the 120 day time frame. A plaintiff's reliance upon a vague promise can be viewed as reasonable and justified, if the plaintiff had sufficient reason to believe that the defendants' commitment to an oral contract modification had been made. See GBM Acquisitions, Inc. v. Susan Adams d/b/a The Waterfront Cafe, 823 A.2d 1121, 1124 (R.I. 2003)

In the present case, several conversations between the parties supported lessor's objectively reasonable belief that both the 60 day deadline and the 120 day deadline had been mutually waived by the parties. Consequently, lessor had no reason to suspect that lessee was planning to extricate himself from the leases if the 120 day time deadline was not met. Moreover, lessee's assertion that it was lessor's choice to demolish the buildings before the 120 day deadline completely ignores the fact that in order to conduct a comprehensive environmental assessment of the properties as they would be when delivered to lessee, all unwanted structures needed to be removed in advance of the 120 day time frame.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Accordingly, after careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.

1. On November 1, 1999, each of the Plaintiffs, MSA and SSA, entered into a commercial Absolute Triple Net Bonded Land Lease with Defendant Gencarelli, collectively referred to as the Leases. Both leases are for a five-year period, commencing on March 1, 2000, with the option of renewal.
2. On November 4, 1999, the parties agreed via cover letters, to amend the leases to include an agreement that if lessee encountered delays in the process of obtaining permits, the lease commencement date for the minimum base rent would be extended accordingly. These amendments were made at the request of Defendant Gencaralli.
3. The 1500 Lease provided that Lessor, at Lessor's expense, would demolish all existing structures on the Demised Premises for the Lessee's benefit, and Lessee would reimburse Lessor $7,800 for said costs. See, *supra*, Facts and Travel.
4. Both leases contained specific conditions precedent to any performance obligation of Defendant Gencarelli as Lessee. See, *supra*, Facts and Travel.
5. The 1500 Lease provided for a Minimum Base Rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 Lease provided for a Minimum Base Rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

6. On February 29, 2000, written notices were sent from Gencarelli to SSA and MSA that purported to exercise Gencarelli's right to terminate the leases. In each of the Termination Notices, Gencarelli asserted that the alleged failure to satisfy the lease contingencies "automatically voids the lease."

7. Prior to receiving the Termination Notices, Sisto had Invoices sent to Gencarelli for both Smith Street and Mineral Spring Avenue to remind Gencarelli of the minimum base rent commencement date under the leases.

8. Defendant Gencarelli, through his actions and the actions of those acting on his behalf, implicitly waived the 60 day time limit for the production of environmental assessments and boundary surveys, and the 120 day time limit for the securing of financing.

9. The phrase "time is of the essence" is not present in the leases and Defendant's behavior suggested that the original time constraints in the leases were flexible.

10. Defendant knew, or should have known well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

11. Defendant breached his implied duty to act in good faith, with due diligence, and to use his best efforts to fulfill his conditions within 120 days after execution of the leases.

12. Up until the time that he sent the termination notices, Defendant, and all those acting on his behalf, manifested an intent to carry through on the leases, regardless of any time provisions originally set forth in the leases.

13. Plaintiffs reasonably relied on Defendant's actions in demolishing the structures on the Mineral Spring Avenue property, in accordance with the 1500 Lease.
14. Plaintiffs have tried to mitigate damages by attempting to sell and/or lease the Mineral Spring Avenue property and the Smith Street property. Despite their marketing efforts, however, they have been unsuccessful in consummating a sale or lease thus far.
15. Plaintiffs have satisfied the Court by a preponderance of the evidence that they are entitled to rent due under the two leases and demolition costs associated with the Mineral Spring Avenue property.

Accordingly, the Court finds for the Plaintiffs and orders Defendant to pay the Minimum Base Rent on both leases for the period commencing on March 1, 2000 through the present date, $3,500 per month under the 1500 Lease and $3,000 per month under the 1800 Lease. Defendant is also ordered to pay the Additional Rent (i.e. taxes and insurance costs/expenses) on both leases for the period commencing on November 1, 1999 through the present date. Additionally, Defendant is hereby ordered to pay for the demolition costs associated with the 1500 Lease in the amount of $7,800. Plaintiffs are entitled to recover from Defendant reasonable attorneys' fees and expenses incurred as a result of Defendant's default under the Leases.

Counsel shall prepare an order consistent with this decision.

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

| | |
|---|---|
| 1800 Smith Street Associates, LP, by and through its General Partner Jason's Realty Corp. | |
| v. | C.A. No: 00-3174 |
| Louis A. Gencarelli, Sr. | |

## JUDGMENT

This action came on for a non-jury trial before this Honorable Superior Court, and the issues having been tried and both findings of fact and conclusions of law having been duly rendered in a written Decision (Indeglia, J.) dated and filed on March 26, 2004, it is hereby

ORDERED and ADJUDGED:

1. that Judgment hereby enters in favor of the Plaintiff, 1800 Smith Street Associates, LP, by and through its general partner Jason's Realty Corp., and against Defendant, Louis A. Gencarelli, Sr., on the Plaintiff's Complaint; and

2. that Plaintiff shall recover from the Defendant under Count I of the Plaintiff's Complaint the amount of $208,992.52, plus attorneys' fees and expenses in the amount of $48,295.50, for the **total sum of $257,288.02**, plus post-judgment interest thereon at the rate of twelve (12%) percent as provided by law.

Dated at Providence, Rhode Island on this __ day of June, 2004.

ENTER:

Justice Gilbert V. Indeglia
6-24-2004

PER ORDER:

Clerk/Deputy Clerk

G:\Visto, Dennis\Gencarelli, Louis A. Sr\Pleadings (Consolidated)\Judgment - Smith Street 052604.doc

EXHIBIT
B

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

1500 Mineral Spring Associates, LP, by and through its General Partner Jason's Realty Corp.

v.

Louis A. Gencarelli, Sr.

C.A. No: 00-3175

**JUDGMENT**

This action came on for a non-jury trial before this Honorable Superior Court, and the issues having been tried and both findings of fact and conclusions of law having been duly rendered in a written Decision (Indeglia, J.) dated and filed on March 26, 2004, it is hereby

ORDERED and ADJUDGED:

1. that Judgment hereby enters in favor of the Plaintiff, 1500 Mineral Spring Associates, LP, by and through its general partner Jason's Realty Corp., and against Defendant, Louis A. Gencarelli, Sr., on the Plaintiff's Complaint; and

2. that Plaintiff shall recover from the Defendant under Count I of the Plaintiff's Complaint the amount of $265,764.28, plus attorneys' fees and expenses in the amount of $48,295.50, for the **total sum of $314,059.78**, plus post-judgment interest thereon at the rate of twelve (12%) percent as provided by law.

Dated at Providence, Rhode Island on this ____ day of June, 2004.

ENTER:

Justice Gilbert V. Indeglia
6-24-2004

PER ORDER:

Clerk/Deputy Clerk

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\Pleadings (Consolidated)\Judgment - Mineral Spring 052604.doc

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

Louis A. Gencarelli, Sr.

v.

1500 Mineral Spring Associates, LP,
1800 Smith Street Associates, LP.
and Jason's Realty Corp.

C.A. No: 00-1732

**JUDGMENT**

This action came on for a non-jury trial before this Honorable Superior Court, and the issues having been tried and both findings of fact and conclusions of law having been duly rendered in a written Decision (Indeglia, J.) dated and filed on March 26, 2004, it is hereby

ORDERED and ADJUDGED:

1. that Judgment hereby enters in favor of the Defendants, 1800 Smith Street Associates, LP, 1500 Mineral Spring Associates, LP and Jason's Realty Corp., on the Plaintiff's Complaint; and

2. that Plaintiff's Complaint is hereby dismissed in its entirety.

Dated at Providence, Rhode Island on this 24 day of June, 2004.

ENTER:

Justice Gilbert V. Indeglia
6.24.2004

PER ORDER:

Clerk/Deputy Clerk

FILED NOV 02 '04 15:46 USBCRI

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re:<br><br>LOUIS A. GENCARELLI, SR.,<br><br>Debtor. | Bk. No. 04-10682<br>(Chapter 11) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS LOUIS A. GENCARELLI, SR.'s INDIVIDUAL BANKRUPTCY PETITION FOR LACK OF GOOD FAITH**

## I. INTRODUCTION

Claimants, 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively referred to herein as the "Creditors"), hereby submit this Memorandum in support of their Motion to Dismiss Louis A. Gencarelli Sr.'s ("Gencarelli") individual petition for bankruptcy pursuant to 11 U.S.C. §1112(b) and §105. Specifically, the Creditors assert that Gencarelli was solvent and had no intention or need to reorganize or rehabilitate when he filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code (the "Code"). Therefore, Gencarelli filed his individual petition in bad faith and is clearly abusing the bankruptcy process.

## II. FACTUAL SUMMARY

On February 27, 2004, Tim Horton's (New England) Inc., ("Horton's") entered into an Asset Purchase Agreement ("Agreement") with Gencarelli and his family business Bess Eaton Donut Flour Company, Inc. (the "Business") for the sale of substantially all of the Business' assets. Gencarelli was the President, CEO and Chairman of the Board of the Business. Gencarelli owned in his individual capacity much of the commercial real estate located in

EXHIBIT C

various locations which was utilized in connection with the operation of the Business (the "Commercial Property"). Furthermore, Gencarelli had personally guaranteed certain liabilities of the Business. As a condition of the purchase of the Business assets, Horton's required Gencarelli to file a voluntary Chapter 11 bankruptcy petition on behalf of the Business and in his individual capacity. <u>See</u> Section 7.1(a) and (b) of the Agreement. On February 27, 2004, Gencarelli also signed a guaranty in which he, *inter alia*, guaranteed payment in full to the Business' unsecured creditors whose claims were allowed in the Chapter 11 case (the "Guaranty").

Shortly after signing the Agreement and Guaranty, a voluntary Chapter 11 bankruptcy petition was filed by the Business on March 1, 2004. A few days later, on March 3, 2004, Gencarelli filed his individual voluntary Chapter 11 bankruptcy petition with this Court. The schedules submitted in support of Gencarelli's individual petition reflect that Gencarelli's assets were valued at approximately $30,788,278.80, and his liabilities were valued at approximately $30,428,937.48. By Order entered on March 18, 2004, this Court, in part, approved the sale of the Business assets and the Commercial Property under §363 of the Code, and authorized the payment of certain secured claims from the sale proceeds at the closing with Horton's. On or about April 23, 2004, a subsequent Order was entered pursuant to which a substantial number of remaining creditors were paid. As of this date, the sale of the Business assets and the sale of the Commercial Property have been consummated, and the substantial amount of proceeds derived from those sales have paid almost all of the secured and unsecured claims of both the Business and Gencarelli. Thus, only a handful of creditors remain. In the end, Gencarelli will receive a large distribution of surplus/excess funds to the tune of several million dollars to line his pockets.

## III. ARGUMENT

Section 1112(b) of the Code provides a non-exhaustive list of "causes" for which a bankruptcy petition may be dismissed. 11 U.S.C.A. §1112(b). Section 1112(b) of the Code does not explicitly state that a bankruptcy filing must be in "good faith," but courts have held that the lack of good faith in filing is an implicit "cause" for dismissal. See In re Bryan, 104 B.R. 554, 557 (Bankr. D. Mass 1989); In re Coastal Cable T.V., Inc., 709 F.2d 762 (1st Cir. 1983); In re Marsch, 36 F.3d 825, 828 (9th Cir. 1994). A petition filed without good faith reflects the petitioner's intent to "abuse the judicial process and the purposes of the reorganization provisions...[p]articularly where there is no realistic possibility of an effective reorganization." Matter of Nancant, 8 B.R. 1005, 1006 (Bankr. D. Mass. 1981). See also In re Eden Associates, 13 B.R. 578 (Bankr. S.D.N.Y. 1981); In re Victory Construction Co., Inc., 9 B.R. 549 (Bankr. C.D. Cal. 1981); In re Dutch Flat Investment Co., 6 B.R. 470 (Bankr. N.D. Cal. 1980). The totality of the circumstances surrounding the filing of the petition determines whether a petition for bankruptcy is filed in good faith. In re Y.J. Sons & Co., 212 B.R. 793, 801 (D. N.J. 1997); In re Liberate Technologies, 2004 Bankr. N.D. Cal. LEXIS 1339, *1, *9 (N.D. Cal. Sept. 8, 2004). A petitioner's solvency is tested by taking the total value of its assets and comparing that figure to the total value of its liabilities (the "balance sheet test"). In re Industrial, Commerical Electrical, Inc., 2004 Bankr. LEXIS 438, *23 (Bankr. Mass. April 27, 2004). A petitioner lacks good faith when it has no need to rehabilitate or reorganize, and the petition cannot serve the rehabilitative purpose of Chapter 11. In re Liberate Technologies, 2004 Bankr. N.D. Cal. LEXIS 1339 at *7; In re SGL Carbon Corp., 200 F.3d 154, 166 (3rd Cir. 1999). "Chapter 11...enable[s] a debtor to continue to operate and to reorganize its business rather than simply to liquidate" its business. 7 Collier on Bankruptcy 1100.01 (15th Revised Edition). A court can determine a lack

of good faith "well before the formal consideration of the plan." In re SGL Carbon Corp., 200 F.3d at 167, fn.19.

In Liberate Technologies, the Court dismissed Liberate's petition because Liberate lacked good faith in filing for bankruptcy. Id., 2004 Bankr. N.D. Cal. LEXIS 1339 at *9. Liberate had cash in excess of its liabilities and did not need the Code's protection to avoid wasteful liquidation of its assets. Id. Liberate argued that offers from potential purchasers of its assets were contingent on its filing for bankruptcy protection and a subsequent sale under Section 363 of the Code. Id. at *24. The Court noted:

> there is no evidence that Congress determined that the procedures under state law for selling a business are inadequate generally, and that all business should have access to the procedural advantages of §363. A company that is able to sell its business as a going concern outside of bankruptcy and can clearly pay all creditors in full does not have a need for bankruptcy relief merely because it might be able to sell on better terms if it could use section 363 to sell the business free and clear of liens and claims.

Id. at *25. Thus, a solvent creditor cannot seek bankruptcy protections simply because it "would benefit from the provisions of the Bankruptcy Code, where such benefit is not necessary to protect creditors or prevent liquidation." Id. at *26.

In Marsch, the Court dismissed Marsch's petition for bankruptcy because her reasons for filing were "not consonant with the purpose of the Bankruptcy Code." Id., 36 F.3d at 828. Marsch filed for individual bankruptcy relief in response to a restitution judgment against her and in favor of her husband. Id. at 825. The Court found that the bankruptcy petition lacked good faith because she was solvent, could satisfy the judgment through her existing assets, and therefore, lacked the proper purpose of filing to reorganize under the protections of the Code. Id.

In SGL Carbon Corp., the Court dismissed SGL Carbon Corporation's ("SGL") Chapter 11 petition because SGL lacked a reorganizational objective, and therefore lacked good faith.

Id., 200 F.3d at 156. SGL was financially healthy and was facing potential, significant antitrust claims. Id. The Court acknowledged that the Code encouraged early filing and that a debtor did not have to be insolvent to file bankruptcy, but could file to rehabilitate before severe financial deterioration. Id. at 163. In the face of its acknowledgment, however, the Court interjected that "[s]uch encouragement...[did] not open the door to premature filing, [or] for the filing of a bankruptcy petition that lacks a valid reorganizational purpose." Id. The Court determined that SGL faced no financial difficulty at the time of filing. Id. SGL argued that it would eventually have to file if the litigation proved adverse to it, and the Court responded, "the mere possibility of a future need to file, without more, does not establish that the petition was filed in 'good faith.'" Id. at 164. The Court held that SGL's reorganization plan lacked a reorganizational purpose because it sought to repay all of its creditors in cash, thereby leaving no creditors for whom to reorganize. Id.

In Y.J. Sons & Co., the Court affirmed the dismissal of the debtor's bankruptcy petition for lack of good faith because the debtor filed to effectuate the sale of his business assets, and therefore, lacked a legitimate rehabilitative purpose. Id., 212 B.R. at 803. The debtor simply wanted a better bargain. Id. In that case, a company who sold a flower shop to Y.J. moved to foreclose on the business' assets due to Y.J.'s default under the terms of a secured promissory note. Id. Soon after, Y.J. entered into a sales agreement for the sale of the business to a third party. Id. A subsequent state court judgment required Y.J. to reserve the proceeds of the sale in an escrow account for repayment of the promissory note. Id. at 798. Y.J. attempted to avoid the state court judgment by filing for bankruptcy under Chapter 11 of the Code. Id. at 799. In conjunction with the petition, Y.J. moved to have the Bankruptcy Court oversee the sale of the business (its only asset) under §363(f) of the Code. Id. The Bankruptcy Court refused to grant

the motions based on the totality of the circumstances, which indicated that Y.J. lacked good faith. Id. at 801. The Court conducted an "on the spot evaluation" of Y.J.'s financial condition, "motives, and the local financial realities." Id. at 802. The Court observed that Y.J. could conduct a 100% disposition of its obligations to both its secured and unsecured creditors. Id. at 803. Y.J.'s ability to enter into a sales agreement independently demonstrated that Y.J. did not need the protection of the Code. Id. Finally, Y.J. had filed the petition in response to the state court judgment directing it to put the proceeds in escrow. Id. Y.J. had no intent or need to reorganize. *It had nothing to reorganize*: its creditors would be paid in full, and its assets had been disposed of completely. Id. The Court further noted that to allow Y.J. to submit a plan in an effort to bolster its attestation of good faith would be a "perversion of reorganization law." Id. at 804.

In the case at hand, the events surrounding Gencarelli's petition for bankruptcy indicate that Gencarelli had no intention or need to reorganize, and his petition cannot serve the rehabilitative purpose of Chapter 11. The totality of the circumstances, as more fully discussed below, demonstrates that, like the debtors in Liberate, SGL, Marsch, and Y.J., Gencarelli filed for purposes other than reorganization. Gencarelli filed for bankruptcy solely to effectuate the sale of the Business assets and the Commercial Property on more preferable terms, *i.e.* free and clear of all liens, claims and encumbrances. Consequently, Gencarelli's individual petition for bankruptcy should be dismissed for lack of good faith because the circumstances of this case clearly indicate that Gencarelli abused the bankruptcy process and the rehabilitative purposes of Chapter 11 of the Code. In short, Gencarelli was solvent, he could have sold the Business assets and Commercial Property outside of bankruptcy and paid all of the obligations owed to the

creditors with the sale proceeds derived therefrom, and he never had the intention or need to reorganize.

Gencarelli and the Business entered into the Agreement with Horton's on February 27, 2004 for the sale of substantially all of the Business' assets. As a condition of the purchase of the Business' assets, Horton's required Gencarelli and the Business to file a voluntary Chapter 11 bankruptcy petition. Only days later, both the Business and Gencarelli filed voluntary Chapter 11 bankruptcy petitions on March 1, 2004 and March 3, 2004, respectively. The factual averments regarding Gencarelli's activities prior to filing for bankruptcy that are set forth in the Objection By Official Committee of Unsecured Creditors To Debtors' First Application For Allowance of Claims And Distribution To Creditors dated June 28, 2004, further supports the Creditors' argument that Gencarelli never had the intention to rehabilitate and did not need the protections of the bankruptcy process. That document states, in pertinent part, the following:

> In anticipation of reaching an agreement with Hortons, the Debtors invited thirty (30) of the largest creditors to an informal meeting to explain its financial situation and **its plan to pay creditors the amounts owed by the Debtors**. The Debtors requested that the creditors form an informal committee (the "Informal Committee") of creditors to work with the debtors with respect to the contemplated sale to Horton's....In consideration of among other things, the creditors forbearance [of collection actions against the Debtors] and support of the sale, Gencarelli guaranteed the outstanding claims against Bess Eaton (the "Gencarelli Guaranty"). The Debtors stated to the Informal Committee that their belief was that, with the Gencarelli Guaranty in place, the contemplated sale to Hortons **would likely pay creditors in full**. (emphasis added)

Furthermore, the schedules filed in support of Gencarelli's bankruptcy petition demonstrate that he did not need the protections of the Code because clearly, he was solvent at the time of his initial filing. In the schedules, Gencarelli states the value of his assets to be approximately $30,788,278.80, and his liabilities are valued at approximately $30,428,937.48. Thus, an "on the spot" evaluation of his assets and liabilities as of March 3, 2004 shows that his

assets reasonably exceeded his liabilities. Gencarelli's solvency is corroborated further by his willingness to execute the personal Guaranty.

Like the debtor in Marsch, Gencarelli was capable of repaying his debts through his existing assets. Although insolvency is not a strict prerequisite to filing for bankruptcy, Gencarelli had no justifiable reason for seeking bankruptcy relief: he was not facing rapid financial deterioration, his assets were not in danger of wasteful liquidation, and as emphasized by the SGL Court, the mere chance that he may have had to file in the future is irrelevant to his good faith in filing the within bankruptcy petition. Furthermore, the terms of the Agreement with Horton's do not excuse or provide justification for the filing of Gencarelli's individual petition for bankruptcy. The Court in Liberate dismissed the debtor's argument that offers to purchase its assets were conditioned on the filing of a bankruptcy petition. The Liberate Court spoke against this manipulative tactic and recognized that nothing in the Congressional history of the Code substantiated a petitioner's use of the Code to effectuate a sale of its assets when the same can be achieved under state law procedures. In this matter, Gencarelli manipulated the Code to liquidate his Commercial Property and the Business assets when he should have conducted those sales under the protections of state law. Rather, Gencarelli used bankruptcy proceedings simply because he, like the petitioner in Y.J., would be able to effectuate those sales on better terms -- free and clear of liens, claims and encumbrances. Thus, Gencarelli's petition cannot serve the rehabilitative purpose of Chapter 11.

Here, the Business was sold to Horton's for significant sums ($41,600,000) on or about May 4, 2004. In fact, certain of Gencarelli's individual creditors, secured and unsecured, received payment of their claims from the proceeds of the sale of the Business assets. See the Order Granting Debtors' First Application For Allowance Of Claims And Distribution To

Creditors entered on July 23, 2004. In addition, the Commercial Property was subsequently sold for a few million dollars, which funds were commingled with the proceeds from the sale of the Business assets. Thereafter, additional claims were paid. Thus, as of this date, Gencarelli has admitted that only a handful of unsecured creditors remain. See Gencarelli's Memorandum In Support Of His Motion For Authority To Release A Portion Of Excess Sales Proceeds dated October 27, 2004. Consequently, there will be no need for a plan of reorganization and thus, there was never a rehabilitative purpose in filing the bankruptcy petition. Furthermore, to allow Gencarelli to file a reorganization plan at this point merely to attempt to show that he had filed in good faith would simply be what the Y.J. Court held to be the "perversion of reorganization law." Id., 212 B.R. at 804. Thus, this Court should ask the same question that was asked by the Court in Coastal Cable T.V., Inc. (where a solvent petitioner filed for bankruptcy simply because it wanted the court to sell the petitioner's assets), *i.e.* was there even a case or controversy within the meaning of the Code. Id., 709 F.2d at 765. The Creditors submit that the answer to that question is "no."

Gencarelli's need for bankruptcy relief is illusory: he was only concerned about selling the Business assets and the Commercial Property utilized by the Business. He was aware that, essentially, the Commercial Property would be the only part of his *individual* bankruptcy estate that would be sold once he filed his petition, and that he planned to use the proceeds from the sale of the Business under §363 to satisfy *both his* and the Business' creditors. Thus, Gencarelli manipulated and abused the judicial process to effectuate the sale and obtain a better bargain.

Finally, the application of the Court's equitable power under 11 U.S.C. §105 should be applied in this matter. 11 U.S.C. §105(a) states:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of any issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Section 105(a) grants to the bankruptcy courts broad equitable power to regulate the use of the bankruptcy process and the conduct of the parties in bankruptcy court. Under this provision of the Code, this Court has the authority, as a matter of equity, "to prevent an abuse of process" by Gencarelli. As previously explained herein, the filing of Gencarelli's individual petition clearly constitutes an abuse of the bankruptcy process.

## IV. CONCLUSION

For all of the reasons set forth above, the Creditors respectfully request that this Honorable Court enter an Order granting the within Motion to Dismiss.

Respectfully submitted,

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: November 2, 2004

**CERTIFICATION**

I hereby certify that a true copy of the within Memorandum was faxed on this 2nd day of November, 2004, to the following:

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

I hereby certify that a true copy of the within Memorandum was sent, first-class mail, postage prepaid, on this 2nd day of November, 2004, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Connecticut Department of Revenue
C and E Division, Bankruptcy Section
25 Sigourney Street
Hartford, CT 06106-5032

Charles S. Sokoloff Incorporated
Eleven Thurber Boulevard
Smithfield, RI 02917

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Porsche Financial Services
4343 Commerce Court, Suite 300
Lisle, IL 60532

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. S\BANKRUPTCY PLEADINGS\Memo in Supp of Motion to Dismiss Gencarelli Petition 110104.doc

RECEIVED
11/8/04

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

In Re: :
:
Louis A. Gencarelli, Sr. : Chapter 11
: Case No. 04-10682
Debtor :

## ORDER

The above-entitled Chapter 11 bankruptcy proceeding having come before the Honorable Arthur N. Votolato, Jr. on this 3rd day of November, 2004, upon 1800 Smith Street Associates, L.P. and 1500 Mineral Spring Associates, L.P., by and through their General Partners, Jason's Realty Corp. (collectively hereinafter after referred to as the "Creditors") Motion to Dismiss Louis A. Gencarelli, Sr.'s Individual Bankruptcy Petition for Lack of Good Faith, and Louis A. Gencarelli, Sr.'s ("Gencarelli") objection thereto, and after considering the papers and pleadings in this matter, as well as the arguments and representations of counsel, in open court, it is hereby

**ORDERED, ADJUDGED & DECREED**

1. The Creditors' Motion to Dismiss is *DENIED,* and Gencarelli's objection thereto is *SUSTAINED.*

Enter as an Order of this Court this 10th day of November, 2004.

Enter: [signature] By Order:

JLD
Clerk

Date: November 10, 2004 Date: November 10, 2004

Entered on Docket: 11/10/04

Judgment#:1:04-bk-10682-236-219

EXHIBIT
D

Presented By:

Joseph P. Ferrucci (#4231)
**Ferrucci Russo, P.C.**
55 Pine Street, 4th Floor
Providence, RI 02903
Tel.: (401) 455-1000
Fax: (401) 455-7778
Dated: November __, 2004

**CERTIFICATION**

I hereby certify that a true copy of the within Order was mailed by first-class mail, postage prepaid to all parties on the attached service list on the __ day of November, 2004.

______________________________

TO THE DEBTOR/DEBTOR'S ATTORNEY:

A copy of this notice could not be mailed to each creditor listed below because the court does not have both a city and state for the creditor or, if being mailed to a foreign country, both a city and country. Immediately contact the court in writing if you believe it failed to properly add to its database all of the addresses you provided in your mailing matrix. Please be advised that a creditor's failure to receive some notice of your case could mean the debt owed to that creditor may not be discharged (debtor should contact their attorney with questions).

IMPORTANT NOTE: YOU MUST SEND A COPY OF THIS NOTICE TO THE CREDITORS LISTED BELOW. THE COURT WILL NOT MAIL THIS NOTICE AGAIN.

For future notices, to correct a creditor's address listed below you must:

(1) Cross out all incorrect information on this page and clearly insert all updated information; (2) Date and sign in the space provided on the bottom of this form; AND (3) Immediately return this page to the court.

IMPORTANT NOTE: YOU MUST ALWAYS INCLUDE ANY ALPHABETIC OR NUMERIC CODE LOCATED TO THE LEFT OF THE CREDITOR'S NAME WHEN CONTACTING THE COURT TO CORRECT A CREDITOR'S ADDRESS!

IMPORTANT NOTE: WHILE YOU MAY CORRECT A CREDITOR'S ADDRESS USING THE ABOVE INSTRUCTIONS, IT IS IMPORTANT TO NOTE THAT, IF YOU WISH TO AMEND YOUR SCHEDULES TO ADD A PREVIOUSLY UNLISTED CREDITOR, YOU MUST CONTACT THE COURT FOR INSTRUCTIONS. LISTING SUCH A CREDITOR ON THIS PAGE IS INSUFFICIENT, AND WILL NOT RESULT IN THE CREDITOR BEING ADDED.

The list of each recipient who was not mailed a copy of this notice, including the portion of the address contained in the court's database for the creditor, is as follows:

| | |
|---|---|
| cr | UPS Capital Business Credit |
| intp | BE Network Acquisition, LLC |
| cr | George Cioe |
| cr | Washington Trust Company (The) |
| intp | Tim Hortons (New England), Inc. |
| cr | First Trade Union Bank |
| cr | Sara Lee Coffee & Tea Foodservice |
| cr | Narragansett Electric Company |
| cr | New England Gas Company |
| intp | Lorraine Randall |
| intp | H. Douglas Randall, III |
| cr | Rockville Bank |
| cr | Aurora Loan Services, Inc. |
| cr | Frances G. Kirchon |
| cr | Angelo A. Gencarelli, III |
| crcm | Creditors' Committee |
| intp | Town of Coventry |
| cr | Chelsea Groton Savings Bank |
| intp | Narragansett Pier Associates |
| cr | Narragansett Bay Commission |
| cr | Town of Stonington |
| cr | Jason's Realty Corp. |
| cr | 1800 Smith Street Associates LP |
| cr | 1500 Mineral Spring Associates LP |
| intp | Sovereign Bank, Network Capital Alliance Division |
| cr | Despina Matsas |

| | |
|---|---|
| cr | Christ Matsas |
| cr | Randolph Savings Bank |
| cr | Eastern Bank |
| cr | DaimlerChrysler Services North America LLC |
| intp | Bess Eaton Donut Flour Company Incorporated |
| cr | R.I. Green, Inc. |
| cr | Volvo Finance North America, Inc. |
| cr | Charles S. Sokoloff Incorporated |
| cr | Charles S. Sokoloff |

Date

Debtor/Debtor's Attorney

***UNITED STATES BANKRUPTCY COURT***
***FOR THE DISTRICT OF RHODE ISLAND***
***380 Westminster Street, 6th Floor***
***Providence, RI 02903***
***www.rib.uscourts.gov***
***(401)528-4477***

---

Louis A. Gencarelli Sr.

Debtor(s)

BK No. 1:04-bk-10682

Chapter 11

Judge: Arthur N. Votolato

---

## *JUDGMENT*

Pursuant to the order entered this date, judgment is hereby entered regarding;

236 - Order Denying Motion to Dismiss Case (Related Doc # [219]).
Appeals/Motion for Reconsideration Due by: 11/22/2004.

Judgment #: 1:04-bk-10682 – 237 – 236

Susan M. Thurston
Clerk, US Bankruptcy Court

Entered on Docket: 11/10/04
Document Number: 237 - 236

By: JLD
Deputy Clerk

judgement.jsp #404

Case Number: 04-10682 Form: 404 Notice Date: 11/12/2004 

TO THE DEBTOR/DEBTOR'S ATTORNEY:

A copy of this notice could not be mailed to each creditor listed below because the court does not have both a city and state for the creditor or, if being mailed to a foreign country, both a city and country. Immediately contact the court in writing if you believe it failed to properly add to its database all of the addresses you provided in your mailing matrix. Please be advised that a creditor's failure to receive some notice of your case could mean the debt owed to that creditor may not be discharged (debtor should contact their attorney with questions).

IMPORTANT NOTE: YOU MUST SEND A COPY OF THIS NOTICE TO THE CREDITORS LISTED BELOW. THE COURT WILL NOT MAIL THIS NOTICE AGAIN.

For future notices, to correct a creditor's address listed below you must:

(1) Cross out all incorrect information on this page and clearly insert all updated information; (2) Date and sign in the space provided on the bottom of this form; AND (3) Immediately return this page to the court.

IMPORTANT NOTE: YOU MUST ALWAYS INCLUDE ANY ALPHABETIC OR NUMERIC CODE LOCATED TO THE LEFT OF THE CREDITOR'S NAME WHEN CONTACTING THE COURT TO CORRECT A CREDITOR'S ADDRESS!

IMPORTANT NOTE: WHILE YOU MAY CORRECT A CREDITOR'S ADDRESS USING THE ABOVE INSTRUCTIONS, IT IS IMPORTANT TO NOTE THAT, IF YOU WISH TO AMEND YOUR SCHEDULES TO ADD A PREVIOUSLY UNLISTED CREDITOR, YOU MUST CONTACT THE COURT FOR INSTRUCTIONS. LISTING SUCH A CREDITOR ON THIS PAGE IS INSUFFICIENT, AND WILL NOT RESULT IN THE CREDITOR BEING ADDED.

The list of each recipient who was not mailed a copy of this notice, including the portion of the address contained in the court's database for the creditor, is as follows:

| | |
|---|---|
| cr | UPS Capital Business Credit |
| intp | BE Network Acquisition, LLC |
| cr | George Cioe |
| cr | Washington Trust Company (The) |
| intp | Tim Hortons (New England), Inc. |
| cr | First Trade Union Bank |
| cr | Sara Lee Coffee & Tea Foodservice |
| cr | Narragansett Electric Company |
| cr | New England Gas Company |
| intp | Lorraine Randall |
| intp | H. Douglas Randall, III |
| cr | Aurora Loan Services, Inc. |
| cr | Frances G. Kirchon |
| cr | Angelo A. Gencarelli, III |
| crcm | Creditors' Committee |
| intp | Town of Coventry |
| cr | Chelsea Groton Savings Bank |
| intp | Narragansett Pier Associates |
| cr | Narragansett Bay Commission |
| cr | Town of Stonington |
| cr | Jason's Realty Corp. |
| cr | 1800 Smith Street Associates LP |
| cr | 1500 Mineral Spring Associates LP |
| intp | Sovereign Bank, Network Capital Alliance Division |
| cr | Despina Matsas |
| cr | Christ Matsas |

Case Number: 04-10682 Form: 404 Notice Date: 11/12/2004 Page 2

| | |
|---|---|
| cr | Randolph Savings Bank |
| cr | Eastern Bank |
| cr | DaimlerChrysler Services North America LLC |
| intp | Bess Eaton Donut Flour Company Incorporated |
| cr | Volvo Finance North America, Inc. |
| cr | Charles S. Sokoloff Incorporated |
| cr | Charles S. Sokoloff |

Date

Debtor/Debtor's Attorney

FILED DEC 20 '04 15:47 USBCRI

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re: LOUIS A. GENCARELLI, SR., Debtor. | Bk. No. 04-10682 (Chapter 11) |

**OBJECTION TO DEBTORS' SECOND MOTION FOR AUTHORITY TO RELEASE A PORTION OF SALES PROCEEDS**

NOW COME 1800 Smith Street Associates, LP ("Smith Street") and 1500 Mineral Spring Associates, LP ("Mineral Spring"), by and through their General Partner, Jason's Realty Corp. (collectively referred to herein as the "Creditors"), and hereby object to the second Motion for Authority to Release a Portion (*i.e.*, $2,500,000) of Excess Sales Proceeds to the Debtor, Louis A. Gencarelli, Sr. ("Gencarelli") dated December 10, 2004 (the "Second Motion"), which is currently scheduled for hearing on December 22, 2004. For the reasons discussed herein, Gencarelli's Second Motion for an interim distribution of a substantial amount of estate funds to himself should be denied.

## I. PERTINENT PROCEDURAL BACKGROUND

On April 15, 2004, each of the Creditors filed their respective Proof of Claim with this Court pertaining to two separate commercial leases executed by Gencarelli. The amount of each claim consisted of two components: (a) the proposed amount of the final Judgment to be entered in the consolidated R.I. Superior Court actions consistent with Justice Vincent Indeglia's written Decision dated March 26, 2004; and (b) the estimated amount of the contingent future rent and "additional rent" under the subject commercial lease, plus additional interest, attorneys' fees and expenses that would continue to accrue on the claim from and after March 31, 2004. Thus, the

EXHIBIT
B

Creditor's claims are for: (a) the amount of the Judgments eventually entered in the state court actions totaling $571,347.80; and (b) the total amount of $272,637.06 for future rent and "additional rent," plus all interest (including post-judgment interest), attorneys' fees and expenses that would continue to accrue on the Creditor's claims. Consequently, the total amount of the Creditors' claims was $843,984.86.

On or about August 13, 2004, Gencarelli filed a Motion to Limit the Allowance of the Claims of the Creditors pursuant to 11 U.S.C. §502(b)(6), which was ultimately granted by this Court during a hearing thereon on September 22, 2004, over the objection of the Creditors. An Order was subsequently prepared and entered by the Court on November 22, 2004, whereby the claims of the Creditors were significantly limited to approximately $99,500 in total. On December 2, 2004, the Creditors timely filed an appeal from the Bankruptcy Court's decision and Order on the §502(b)(6) limitation/cap issue.

On or about October 27, 2004, Gencarelli filed his first Motion for Authority to Release a Portion (*i.e.*, $500,000) of Excess Sales Proceeds (the "First Motion"). On November 2, 2004, the Creditors filed their Objection to the First Motion and also filed a Motion to Dismiss Gencarelli's Individual Bankruptcy Petition For Lack Of Good Faith, together with a supporting Memorandum.[1] In said Motion to Dismiss, the Creditors established that Gencarelli was solvent and had no intention or need to reorganize or rehabilitate when he filed for bankruptcy relief under Chapter 11 of the U.S. Bankruptcy Code and, therefore, Gencarelli filed his individual petition in bad faith and is clearly abusing the bankruptcy process. Nevertheless, during a hearing held the next day on November 3, 2004, the Court granted Gencarelli's First

[1] For purposes of preserving the record, the Creditors incorporate herein by reference the arguments previously made in their Objection to the First Motion and in their Memorandum in Support of the Motion to Dismiss, each dated November 2, 2004.

Motion for an interim distribution of sales proceeds and summarily denied the Creditors' Motion to Dismiss on the state of the record as it existed at that time. On November 10, 2004, an Order was subsequently entered by this Court which denied the Creditors' Motion to Dismiss the individual Chapter 11 bankruptcy petition of Gencarelli on the ground of lack of good faith pursuant to 11 U.S.C. §1112(b) and §105. On November 19, 2004, pursuant to 28 U.S.C. §158(a)(3) and Federal Rule of Bankruptcy Procedure 8001(b), the Creditors timely filed a Notice of Appeal and Motion for Leave to Appeal from the Order and Judgment entered by the Court on November 10, 2004. On November 23, 2004, the Creditors' Notice of Appeal and Motion for Leave to Appeal were docketed with the U.S. District Court for the District of Rhode Island (C.A. No. 04-496T).

On December 10, 2004, despite clear knowledge of both of the Creditors' appeals as aforesaid, which if determined in favor of the Creditors would increase and may even restore the original amount of their claims (*i.e.*, $843,984.86), Gencarelli filed the within Second Motion for an interim distribution to himself of $2.5 Million of the sale proceeds, so that he may allegedly pay his <u>unidentified</u> tax creditors <u>unspecified</u> "substantial tax obligations" that are "in excess of $2,000,000.00." In support of said request, Gencarelli makes the mere bald assertion that the payment of those tax obligations "prior to year-end will result in the avoidance of additional tax liabilities and provide overall benefit to his estate." *See* ¶3 of Gencarelli's Memorandum of Law in Support of his Motion for Expedited Hearing, dated December 10, 2004.

In addition, in the Memorandum in support of his Second Motion, Gencarelli averred that the remaining disputed claims in this case total $388,854.30, and further stated that after the release of the requested $2.5 Million, the balance of the "excess" sales proceeds (approximately $4.1 Million) will be available and held in escrow. However, on December 15, 2004, Gencarelli

filed a Supplement to his Second Motion wherein he revealed that, in addition to the amount of the remaining disputed claims set forth in his prior Memorandum, professional fees and administrative expenses are "projected not to exceed approximately $1,750,000 in total, leaving a balance in the Debtor's estate of approximately $2,891,000" if his Second Motion is granted. *See* ¶3 and ¶4 of Supplement. Moreover, in the Supplement, Gencarelli disclosed and informed the Creditors, for the first time, that Tim Hortons (New England) Inc. ("Tim Hortons") "may have claims against the Debtor's estate." *See* ¶5 of Supplement. Thus, the amount of available so-called excess/surplus funds in the Debtor's estate would dwindle even further if the Tim Hortons claims come to fruition.

Finally, it cannot be disputed that this case has always proceeded as a Chapter 11, no trustee has been appointed and the Debtor has remained in control of his affairs. Furthermore, it cannot be disputed that a substantial distribution of estate funds were allowed and already made to creditors even though no Chapter 11 plan of reorganization was ever filed or confirmed.

## II. ARGUMENT

The general rule in Chapter 11 cases is that distribution from a debtor's estate is not permitted until after a plan of reorganization has been filed and confirmed, absent extraordinary circumstances. *In re Swallen's, Inc.*, 269 B.R.634, 637-639 (6th Cir. B.A.P. 2001); *In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 784-787 (W.D.Pa. 1988). Interim distributions without a confirmed plan are contrary to the provisions of the Bankruptcy Code §§1106, 1107, 1121-1129, Bankruptcy Rule 3021, and the clear policy behind Chapter 11 reorganizations, *i.e.* successful rehabilitation after a plan is confirmed. *See id.* An order allowing the requested distribution of the sales proceeds to Gencarelli would allow him to further circumvent the provisions of the Bankruptcy Code for the administration of a case under Chapter 11. As highlighted by the Sixth

Circuit B.A.P. in *Swallen's*, "the debtor should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with the sale of assets." *Id.* at 637-638 (citation omitted). The court further noted:

> At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.

*Id.* at 638.

In this matter, Gencarelli has made no good faith effort to formulate, propose and/or implement a plan. Rather, the Debtor has been allowed to make piecemeal, pre-confirmation payments to creditors and even one to himself. Furthermore, because Gencarelli has been permitted to make pre-plan distributions in this unconventional fashion, he has had little incentive to for completing the requirements of the disclosure statement and obtaining approval of a plan. *See Swallen's*, 269 B.R. at 637 (citing *Conroe Forge*, 82 B.R. at 784-785).

Furthermore, Gencarelli has not established any extraordinary circumstances to justify the interim distribution of the substantial sum of $2.5 Million to himself. Bald, conclusory allegations of: (a) unsubstantiated and unidentified tax obligations; and (b) a benefit to the estate if those tax obligations are paid by the end of 2004, clearly cannot meet the extraordinary circumstances standard. Gencarelli has not put forth a single piece of evidence to support his assertions. Thus, his Second Motion for an interim distribution must be denied.

## III. CONCLUSION

For all of the reasons set forth above, the Creditors respectfully request that Gencarelli's Second Motion for the interim distribution of $2.5 Million to himself be denied.

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: December 20, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the within Objection was faxed on this 20th day of December, 2004, to the following:

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

I hereby certify that on this 20th day of December, 2004, a true copy of the within Objection was sent via first class mail, postage pre-paid, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Objection to Gencarelli's Second Motion to Release Portion ofSales Proceeds 121704.doc

RECEIVED

DEC 2 3 2004

MacADAMS & WIECK
INCORPORATED

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

In re:

BESS EATON DONUT FLOUR COMPANY, INC. — Chapter 11, Case No.: 04-10630

In re:

LOUIS A. GENCARELLI, SR., Debtor — Chapter 11, Case No.: 04-10682

**LOUIS A. GENACARELLI, SR.'S RESPONSE TO OBJECTION TO DEBTOR'S SECOND MOTION FOR AUTHORITY TO RELEASE A PORTION OF SALES PROCEEDS**

NOW COMES Debtor Louis A. Gencarelli, Sr. ("Gencarelli"), by and through counsel, and hereby responds to the Objection of 1800 Smith Street Associates, LP ("Smith Street") and 1500 Mineral Spring Associates, LP ("Mineral Spring"), (collectively hereinafter referred to as the "Creditors") to Debtor's Second Motion for Authority to Release a Portion of Sales Proceeds as follows:

1. Attached hereto as Exhibit "A", is the Affidavit of Charles L. Germany, accountant of Gencarelli and Bess Eaton Donut Flour Company, Inc. which states with specificity the outstanding tax payments owed.

2. With respect to the so-called claims of Tim Hortons (New England) Inc. ("Tim Hortons"), it has raised two potential claims: (i) a claim for sewer and water deficiencies regarding certain locations which it acquired ("Location Claim"); and (ii) a claim relative to a 1983 Franchise Agreement ("Franchise Claim") (declaratory judgment pleadings filed with this Court are attached as Exhibit "B" ). At this Court's request, counsel to Gencarelli requested that

EXHIBIT C

counsel to Tim Hortons provide an estimate as to an amount beyond which the claims could not **possibly** exceed.

3. Edward Bertozzi, Esq., on behalf of Tim Hortons, has advised that his client estimates the potential Location Claim to be "less than $1,000,000." Debtors have provided substantial documentation to Tim Horton's in support of Debtors' position that no monies are owing in connection with this claim. It is Debtors' opinion that the above estimate is a substantially overstated cap.

4. The Franchise Claim relates to Debtor's obligation under the Asset Purchase Agreement and amendments thereto with Tim Hortons to confirm the termination of a former Bess Eaton franchise agreement dating back to 1983. Debtors have filed a declaratory judgment action in this Court seeking Court confirmation of the termination of the franchise. Debtor Gencarelli's opinion is that this is a nuisance claim. The franchisee defaulted under the Franchise Agreement when it ceased operations in 2003. Moreover, it was in payment default under the Franchise Agreement. Finally, the agreement is executory in nature and would be rejected in Debtor Bess Eaton's bankruptcy proceeding had it been effective. Therefore, there can be no exposure on the claim.

5. In sum, we are again dealing with an objection of the Creditors whose claims have been determined by this Court to be $99,532.27. There is no stay of Court's ruling and therefore, Creditors are bound in all respects by this Court's determination of their claims, notwithstanding their decision to appeal. The numbers therefore are as follows:

| | |
|---|---|
| Cash on Hand | $7,566,000.00 |
| Less: | |
| Reserve for Wieck, UPS, Moreau and Miscellaneous | (425,000.00) |
| **Cash Net of Reserve** | **$7,141,000.00** |

Less:

Proposed Distribution to Gencarelli............................................ (2,500,000.00)

**Cash Remaining After Distribution ......................................$4,641,000.00**

Over and above the reserves set forth above, the balance would be a "buffer" for administrative claims, disputed claims or, ultimately, release to Gencarelli at this Court's discretion upon request by Debtor.

6. The Creditors' claims (although limited to $99,532.27 by this Court) had a stated "high value" of approximately $800,000.00. Therefore, even if the Creditors were successful on appeal and could prove this amount substantial excess sums remain on hand.

WHEREFORE, the debtor respectfully requests this Honorable Court grant Debtor's Motion for Authority to Release a Portion of Excess Sale Proceeds.

LOUIS A. GENCARELLI, SR.

By his attorney,

Joseph P. Ferrucci /ga

Joseph P. Ferrucci (#4231)
Christopher M. Mulhearn (#5188)
Ferrucci Russo P.C.
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Dated: 12/23/04

## CERTIFICATION

I hereby certify that on the 23rd day of December 2004, I forwarded a true copy of the within objection by regular mail, postage prepaid to the parties set forth on the attached list.

Brenda L. Vucci

**Please take notice:** That within ten (10) days after service (twenty (20) days for U.S. Government Officers and Agencies thereof), any party against whom a "Pleading" is filed, or any other party to the action who objects to the relief sought therein, shall serve and file an Objection to that Pleading. If no Objection is filed to a Pleading within the time prescribed herein, the Pleading will be deemed unopposed and will be granted, unless (1) the requested relief is prohibited by law; or (2) the requested relief is against public policy; or (3) in the opinion of the Court, the interests of justice requires Sua Sponte denial of the unopposed Motion.

In Re: Louis A. Gencarelli, Sr.
B.K. No.: 04-10682

**SERVICE LIST**

Allan M. Shine, Esq.
Winograd Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903

Leonard DePasquale, Esq.
United States Trustee
10 Dorrance Street, Suite 10
Providence, RI 02903

D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02110

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Theodore Orson, Esq.
55 Dorrance Street
Providence, RI 02903

Richard S. Mittleman, Esq.
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903

William M. Dolan, III, Esq.
Brown Rudnick Berlack Israels, LLP
121 South Main Street
Providence, RI 029031

Michael P. Lynch, Esq.
117 High Street
P.O. Box 761
Westerly, RI 02891

Matthew J. McGowan, Esq.
321 South Main Street, Suite 301
Providence, RI 02903

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

In Re:

BESS EATON DONUT FLOUR COMPANY, INC. — Chapter 11, Case No.: 04-10630

LOUIS A. GENCARELLI, SR., Debtor — Chapter 11, Case No.: 04-10682

**AFFIDAVIT OF CHARLES L. GERMANY**

I, the undersigned, do hereby, under oath, make affidavit and say as follows:

1. I am the accountant for the bankruptcy estate of Louis A. Gencarelli, Sr. and Bess Eaton Donut Flour Company, Inc.

2. There are two past due tax payments of estimated tax for the fiscal year ending February 28, 2005 from Louis A. Gencarelli, Sr. on behalf of his bankruptcy estate.

3. These payments were due and payable on August 16, 2004 and November 15, 2004, respectively.

4. The total amount due on August 16, 2004 was $800,000.00, which includes federal and appropriate state taxes.

5. The total amount due on November 15, 2004 was $800,000.00, which includes federal and appropriate state taxes.

6. Interest and penalties are accruing on each of the above-referenced payments on a daily basis.

7. There is a final estimated tax payment due by March 15, 2005 in the amount of $800,000.00.

8. The sooner these payments are made, the lower the assessed interest and penalties will be.

9. It would be beneficial for the estate Louis A. Gencarelli, Sr. to make these estimated payments as soon as is practicable, so that the assessed interest and penalties will be able to be minimized.

EXHIBIT
tabbies
A

Charles L. Germany, CFP, CPA, PFS, ABV

STATE OF Georgia
COUNTY OF Fulton

In Atlanta on this 21[th] day of December, 2004, before me personally appeared Charles L. Germany to me known by me to be the party executing the foregoing instrument and he acknowledged said instrument executed to be his free act and deed.

NOTARY PUBLIC
My commission expires: ____________

otary Public, Cobb County, Georgia
My Commission Expires Feb. 19, 2007

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **In Re:** | : | |
| **Bess Eaton Donut Flour Company Incorporated** | : | **Chapter 11** <br> **Case No. 04-10630** |
| **Debtor** | : | |
| **In Re:** | : | |
| **Louis A. Gencarelli, Sr.** | : | **Chapter 11** <br> **Case No. 04-10682** |
| **Debtor** | : | |
| **Bess Eaton Donut Flour Company Incorporated and Louis A. Gencarelli, Sr.,** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **Adversary No. AP** |
| **Bess Eaton of New Britain, Inc., James Serruta, and James V. Serruta** | : | |
| **Defendants** | : | |

**<u>COMPLAINT FOR DECLARATORY JUDGMENT</u>**
**<u>AND OTHER RELIEF</u>**

Plaintiffs, Bess Eaton Donut Flour Company Incorporated and Louis A. Gencarelli, Sr., file this Complaint for Declaratory Judgment seeking a declaration that Defendants have no further rights under the Franchise Agreement addressed herein and that Plaintiffs have no obligation to Defendants. In the event that the Court finds the parties have any rights and/or obligations under the Franchise Agreement, Plaintiffs request this Court to authorize Plaintiffs to reject the Franchise Agreement pursuant to 11 U.S.C. § 365(a).

EXHIBIT
B

1. Plaintiff Bess Eaton Donut Flour Company Incorporated ("Bess Eaton") filed a petition for relief under Chapter 11 of the Bankruptcy Code on March 1, 2004, which is pending in this Court as Case No. 04-10630.

2. Plaintiff Louis A. Gencarelli, Sr. ("Gencarelli") filed a petition for relief under Chapter 11 of the Bankruptcy Code on March 3, 2004, which is pending in this Court as Case No. 04-10682.

3. Upon information and belief, Defendant Bess Eaton of New Britain, Inc. ("BE/NB") is a Connecticut corporation with its principal place of business at 876 West Main Street, New Britain, Connecticut.

4. Upon information and belief, Defendant James Serruta is an individual residing in Avon, Connecticut.

5. Upon information and belief, Defendant James V. Serruta is an individual residing in Avon, Connecticut.

6. This adversary proceeding arises out of and relates to Plaintiffs' Chapter 11 cases. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334 and 2201. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

7. On or about July 23, 1983, Bess Eaton and BE/NB entered into a Franchise Agreement which authorized BE/NB to act as a Bess Eaton franchisee in New Britain, Connecticut. A copy of the Franchise Agreement is attached as **Exhibit A** (the "Franchise Agreement").

8. At all times relevant to this action, Defendant James Serruta was the President of BE/NB and a guarantor of BE/NB's obligations under the Franchise Agreement.

9. At all times relevant to this action, Defendant James V. Serruta was a guarantor of BE/NB's obligations under the Franchise Agreement.

**COUNT I - DECLARATORY JUDGMENT**

10. Plaintiffs incorporate by reference the allegations of paragraphs 1-8.

11. Upon information and belief, BE/NB ceased operating under the Franchise Agreement on or about January 2003. BE/NB's cessation of operations constituted a default under the Franchise Agreement.

12. At the time it ceased operating, BE/NB was in default of its obligations under the Franchise Agreement because of its failure to make payments required by the Franchise Agreement.

13. BE/NB's Franchise Agreement and BE/NB's rights thereunder terminated due to BE/NB's failure to cure its defaults under the Franchise Agreement and its failure to operate the franchise.

14. Defendants have no further rights or claims under the Franchise Agreement.

15. The Asset Purchase Agreement (the "APA") entered into among Plaintiffs and Tim Hortons (New England), Inc. ("Tim

Hortons") requires Plaintiffs to obtain from BE/NE "a release of all claims, including in respect of the trademark "Bess Eaton" in a form satisfactory to Tim Hortons and without payment of any consideration..." APA at Section 7.29.

16. Upon information and belief, Defendants refused to give Plaintiffs the release required by Section 7.29 of the APA with being paid consideration for the release.

17. Pursuant to a letter agreement between Plaintiffs and Tim Horton's dated May 5, 2004, Plaintiffs agreed to seek "a legally binding determination by the Bankruptcy Court that the former franchisee has no valid rights or claims against Bess Eaton, including any rights to operate a Bess Eaton's franchise or any rights in respect to the trademark 'Bess Eaton'" in lieu of the release of claims required by the APA. Letter Agreement dated 5/5/04 at ¶ 2.

WHEREFORE, Plaintiffs request that this Court declare the rights and legal relations of the parties to this action, specifically finding the Franchise Agreement terminated, that Defendants have no further rights or claims against Bess Eaton, including any rights to operate a Bess Eaton's franchise or any rights in respect of the trademark "Bess Eaton", and that Plaintiffs are released from any obligations under the Franchise Agreement.

**COUNT II - REJECTION OF EXECUTORY CONTRACT**

Without waiver of or prejudice to Plaintiffs' contention that Defendants have no further rights or claims under the Franchise Agreement, the Franchise Agreement terminated and that Plaintiffs have no obligations to Defendants, in the event that the Court finds the parties have any rights and/or obligations under the Franchise Agreement, Plaintiffs request that this Court authorize Bess Eaton to reject the Franchise Agreement pursuant to 11 U.S.C. § 365(a).

18. Plaintiffs incorporate by reference the allegations of paragraphs 1-16.

19. The Franchise Agreement no longer has any benefit to Bess Eaton's bankruptcy estate and, instead, is contrary to the interests of Plaintiffs and the Court-approved purchaser of Plaintiffs' assets and operations.

20. Rejection of the Franchise Agreement reflects the reasonable business judgment of Bess Eaton and is in the best interest of Plaintiffs' bankruptcy estates.

WHEREFORE, Plaintiffs request this Court to enter an Order declaring the Franchise Agreement to have been rejected, that Defendants have no rights to operate a Bess Eaton's franchise or any rights in respect of the trademark "Bess Eaton", and that Plaintiffs are released from any obligations under the Franchise Agreement.

**BESS EATON DONUT FLOUR COMPANY INCORPORATED**

By its Attorney,

Melissa Horne

Melissa M. Horne, Esq.
State Bar No. 5291
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
Telephone: (401) 273-8300
Facsimile: (401) 272-5728

Dated: 11/10/04

**LOUIS A. GENCARELLI, SR.**

By His Attorneys,

By ______________________

Joseph Ferrucci, Esq.
State Bar No. 4231
Ferrucci Russo, PC
55 Pine Street
Providence, RI 02903
Telephone: (401) 455-1000
Facsimile: (401) 455-7778

Dated: 11/10/04

# EXHIBIT A

130 So Main

EXHIBIT A

FRANCHISE AGREEMENT

AGREEMENT made this 23rd day of July, 1983, by and between BESS EATON DONUT FLOUR COMPANY, INCORPORATED, a Connecticut corporation having its principal place of business in the State of Rhode Island (hereinafter referred to as "Bess Eaton") and BESS EATON OF NEW BRITAIN, INC., a Connecticut corporation having its principal place of business at 876 West Main Street, New Britain, Connecticut (hereinafter referred to as "Franchised Retailer");

WHEREAS, Bess Eaton has developed and obtained knowledge and a high degree of experience in the fields of production, merchandising, distribution and promotion of the sale of doughnuts, doughnut flour and related products and has established a valuable reputation, demand and good will for said products under the name "Bess Eaton Donuts", which has come to signify the highest standards of management, supervision, merchandising and quality; and

WHEREAS, the Franchised Retailer and Bess Eaton have been in a franchisor-franchisee relationship pursuant to an oral franchise agreement; and

WHEREAS, the parties have reached agreement on certain changes regarding their franchise relationship and wish to reduce such agreement to writing;

NOW, THEREFORE, in consideration of the premises and the covenants and conditions hereafter set forth, the parties covenant and agree as follows:

1. Grant of Franchise. Bess Eaton hereby gives and grant to the Franchised Retailer the exclusive right to engage, pursua to the terms hereof, in the business of producing and selling doughnuts and related products under the name "Bess Eaton Donuts within a territory more particularly described in Paragraph 21 below, and in particular at the following location: 130 South Main Street, New Britain, Connecticut (hereinafter sometimes re- ferred to as the "Franchised Retailer's Premises" or "the Premises"). In the event that the Franchised Retailer's lease of the premises at 130 South Main Street, New Britain, Connectic shall terminate for any reason, then the Franchised Retailer sha have the right to select a new location within the territory des cribed in Paragraph 21 below, and such new location shall be deemed to be the "Franchised Retailer's Premises" or the "Premis for purposes of this Agreement.

2. Purchase of Materials, Products and Supplies.

(a) The Franchised Retailer shall purchase from Bess Eaton, or from such sources as shall be approved in writing by Bess Eaton, all doughnut flours (other than French and whole whe flour), shortenings, fillings and jellies used in the production of "Bess Eaton Donuts" and all coffee and tea sold by the Fran- chised Retailer as "Bess Eaton" coffee or tea. Bess Eaton agree to supply the Franchised Retailer with its requirements of such items, or to designate and approve other sources thereof. It is expressly understood and agreed that the foregoing agreement of the Franchised Retailer is for the sole purpose of maintaining the distinctive, exclusive and unique character, quality and taste of "Bess Eaton" Donuts and "Bess Eaton" coffee and tea without which the within grant of franchise would be of only nominal value to the Franchised Retailer, it being understood

that each other franchised retailer similarly shall agree to purchase the items identified in this subparagraph (a) from Bess Eaton, or from such sources as shall be approved in writing by Bess Eaton, to the end that each Bess Eaton franchised retailer shall be serving and selling "Bess Eaton" Donuts and "Bess Eaton" coffee or tea of the same distinctive, exclusive and unique character, quality and taste. The items to which thi subparagraph (a) applies are designated on Exhibit A attached hereto by single asterisks (*) in the left margin thereof.

(b) With respect to any product, supplies, equipment or raw materials required in the conduct of the business of the Franchised Retailer (other than that governed by subparagraph (a above), the Franchised Retailer is under no obligation to purcha the same from Bess Eaton or from sources supplied by Bess Eaton : long as all such products, supplies, equipment and raw materials purchased from any other source reasonably conform to Bess Eaton established specifications and standards, if any, as to quality, size, appearance and design thereof. It is the purpose of such specifications and standards to ensure high standards of quality for each franchised retailer and also to achieve reasonable uniformity among all franchised retailers, it being understood that uniformity in quality, size, appearance and design is an essentia element in the success of every franchise business serving the consuming public on a volume basis. Bess Eaton will promptly furnish such standards and specifications to a potential supplier upon written request of the Franchised Retailer or of a potential supplier.

3. Price of Materials, Products and Supplies.

(a) The prices to be charged to the Franchised Retail by Bess Eaton pursuant to Paragraph 2 above shall be those price which are in force and effect from time to time in respect to th same items purchased by other franchised retailers from Bess Eaton (subject to subparagraph (c) below). A copy of the price list in effect at the time of the signing of this Agreement is annexed hereto and made a part hereof as Exhibit A. Bess Eaton agrees to give the Franchised Retailer prompt written notice of any changes in such prices.

(b) The Franchised Retailer agrees to use its best efforts, insofar as practicable, to give Bess Eaton advance oral or written notice of the Franchised Retailer's intention or deci sion to discontinue indefinitely or permanently purchasing certa Paragraph 2(b) items from sources other than Bess Eaton. The items to which this subparagraph (b) applies are designated on Exhibit A by a double asterisk (**) in the left hand margin. It is understood and agreed that the Franchised Retailer's purchasi such items from outside sources from time to time, but without a decision or the intention to discontinue indefinitely or permanently purchasing such items from Bess Eaton, shall not be construed to be a breach of the Franchised Retailer's obligations under this subparagraph.

(c) Notwithstanding the foregoing, if and when the Franchised Retailer (including, for this purpose, James Serruta and James V. Serruta) owns or controls certain numbers of locations, Bess Eaton agrees to give the Franchised Retailer a discount on purchases of items described in Paragraph 2(a) and (b)

above from Bess Eaton (other than equipment or utensils) as follows:

| Number of Locations | Percentage Discount |
|---|---|
| 5-7 | 1% |
| 8-9 | 1 1/2% |
| 10-11 | 2% |
| 12 or more | 2 1/2% |

provided that payment for such purchases is made within fourteen (14) days after delivery, and provided further that the purchase is not, at the time of delivery, in default of its obligations pursuant to this Agreement (in accordance with the terms of Paragraph 14 below). Bess Eaton hereby states its intent to afford similar such discounts to any other franchised retailer owning o controlling similar numbers of locations.

4. Excusable Delay. No party shall be liable for any delay in the performance of its obligations under this Agreement (other than to make timely payment of any sums due hereunder) if such delay shall be due to any cause beyond the reasonable contrc of such party. In the event of such a delay on the part of Bess Eaton in delivering any equipment, products or merchandise, it shall designate alternative sources for such items.

5. Standards of Service and Appearance. During the term of this Agreement, the Franchised Retailer shall conform to Bess Eaton's standards of service in connection with the conduct of the Franchised Retailer's business and standards respecting the physical appearance of the Premises, provided such standards are uniformly applied to and enforced against all "Bess Eaton" locations, whether franchised or not. Bess Eaton may inspect the operation of the Franchised Retailer's business at the Premises for the purpose of determining compliance with this Paragraph.

6. Accounting. Bess Eaton shall advise the Franchised Retailer of the uniform system of accounts in effect from time to time in respect to all "Bess Eaton" locations, whether franchased or not, and shall initially supply instruction in establishing and maintaining such system of accounts. The Franchised Retailer shall provide Bess Eaton with a weekly report of Gross Sales (as hereinafter defined) on or before Tuesday of each week for the seven (7) day period ending at the close of business on Wednesday of the previous week. The Franchised Retailer shall utilize cash registers which accumulate sales, which register all sales, and which have no resetting devices. Bess Eaton may inspect the books and records of the uniform system of accounts pertaining to Gross Sales upon reasonable advance notice during business hours as may be necessary or advisable in the reasonable judgment of officials of Bess Eaton. Bess Eaton agrees to hold any information obtained from the Franchised Retailer in strict confidence.

7. Payment by Franchised Retailer. In consideration of the rights granted herein to the Franchised Retailer, the Franchised Retailer shall pay to Bess Eaton each calendar year, or part thereof, during the term of this Franchise Agreement, a sum equal to two percent (2%) of the Franchised Retailer's Gross Sales at the Premises. For purposes of this Agreement, "Gross Sales" shall not include sales taxes or other taxes of a similar nature, nor sales of cigarettes or other tobacco products. The Franchised Retailer shall make available for reasonable inspection by Bess Eaton personnel all original books and records that Bess Eaton may determine to be necessary or advisable to record and ascertain "Gross Sales". The Franchised Retailer shall remit to Bess Eaton the sum due pursuant to the terms of this Paragraph 7 promptly after receipt by it of a monthly statement therefor issued by Bess Eaton.

8. Restrictions. It is understood and agreed that Bess Eaton has granted the within franchise to the Franchised Retaile in part because of the suitability of the site in which the Franchised Retailer conducts its business. Therefore, the Franchise Retailer hereby agrees that it shall not, during the term of thi Agreement, sell, lease, transfer, convey, assign or sublease the Premises or any part thereof or interest therein without in each instance first giving prior written notice to Bess Eaton of its intent to enter into such a transaction. No such notice shall b necessary with respect to a bona fide mortgage or similar encumbrance on the Premises in favor of a bank or other financial institution. It is agreed that the damages which would be suffered by Bess Eaton in the event of the breach by the Franchised Retailer of its obligations under this Paragraph would be considerable, although the amount cannot be accurately determined. Therefore, it is agreed that in the event of such a breach which results in the Franchised Retailer's inability to continue operations at the Premises during the term of this Agreement, the Franchised Retailer shall pay to Bess Eaton the cash sum of Ten Thousand Dollars ($10,000) which, it is mutually agreed, shall constitute liquidated damages in a reasonable amoun and not a penalty. It is further agreed that the Franchised Retailer's inability to continue to operate at a location because of a lease termination with third party landlords shall not be deemed to be a breach of this Paragraph.

9. Best Efforts. The Franchised Retailer agrees to exert its best efforts to establish and increase sales of products sold by it under the trade name "Bess Eaton Donuts" and shall, subject to all of the terms of this Agreement, maintain at all times a sufficient supply of said products.

10. Personnel. All personnel employed by the Franchised Retailer shall comply with uniform standards of sanitation, clea liness and demeanor as may be established by Bess Eaton and applicable to all Bess Eaton locations, whether franchised or not. In the event any employee performs work which in the opini of Bess Eaton and the Franchised Retailer requires special skill or knowledge, said employee shall be specially trained at the direction and expense of Bess Eaton. Any personnel receiving such special training (other than any party hereto) shall execut non-competition contracts if required by Bess Eaton. Failure to do so promptly shall permit Bess Eaton to terminate the Agreement on ten (10) days notice to the Franchised Retailer.

11. Advertising.

(a) The Franchised Retailer shall pay to Bess Eaton with respect to each calendar year, or part thereof, during whic this Franchise Agreement is in force a sum equal to one-half of one percent (1/2%) of the Franchised Retailer's Gross Sales at the Premises, payable as provided in Paragraph 7 above. Bess Eaton hereby agrees to utilize all sums received from its Franchised Retailers pursuant to this Paragraph (or its counterpart or counterparts in other franchise agreements) solely in connection with advertising the products, name, trade marks and good will which are the subject of this Franchise Agreement. The character, frequency, media and all other aspects of such advertising shall be determined solely by Bess Eaton inasmuch as it i contemplated that the emphasis of such advertising shall be insti tutional in nature rather than intending to benefit any particul Franchised Retailer or group of franchised retailers. Bess Eato agrees to give each franchised retailer, annually, an accounting of where and how said sums were expended. It is contemplated anc

expected that in addition to the aforesaid institutional advertising, individual franchised retailers, at their own expense, will advertise with respect to their specific franchised busines operation.

(b) All advertising by the Franchised Retailer, which is materially and substantially different from that heretofore used by it, shall be submitted in writing to Bess Eaton for its approval. Unless rejected in writing by Bess Eaton within sever (7) days after receipt, such advertising shall be deemed to be approved.

12. Insurance. The Franchised Retailer shall maintain in effect during the term of this Agreement with insurance companie licensed by the State of Connecticut insurance, in such amounts as the Franchised Retailer shall reasonably determine, for the benefit of Bess Eaton (as well as for the benefit of the Franchised Retailer) covering comprehensive public liability. The Franchised Retailer shall supply Bess Eaton with certificates of such insurance and shall promptly pay the premiums on said policies as and when the same become due. The Franchised Retailer hereby agrees to indemnify and hold Bess Eaton harmless from and against any and all claims, demands, charges and losses arising out of the conduct by the Franchised Retailer of its operations pursuant to or in violation of this Agreement. Bess Eaton agree: to indemnify and hold the Franchised Retailer harmless from and against any and all claims, demands, charges and losses arising out of the conduct by Bess Eaton of its business or the manufacture or handling by it of its products.

13. Ownership of Trade Name and Trade Mark. The Franchise Retailer hereby acknowledges the validity of and the ownership i Bess Eaton of the trade name "Bess Eaton Donuts" and "Bess Eaton' and any trade marks, designs and advertising in any way related thereto, and agrees that upon termination of this Agreement for whatever cause the permission to use the same pursuant hereto and all interest of the Franchised Retailer therein shall terminate automatically.

14. Termination by Bess Eaton.

(a) If a petition in bankruptcy shall be filed by the Franchised Retailer or against the Franchised Retailer and not discharged in thirty (30) days, or a receiver shall be appointed for its property or affairs, or if the Franchised Retailer shall make an assignment for the benefit of creditors, or (except as hereinafter provided) shall merge, consolidate, dissolve or sell substantially all of its assets, or shall be in default of its obligations hereunder, then Bess Eaton may terminate this Agreement upon notice in writing to the Franchised Retailer, and upon receipt of such notice by the Franchised Retailer, this Agreement and all rights of the Franchised Retailer hereunder shall terminate automatically but such termination shall not affect the obligations of the Franchised Retailer arising out of this Agreement prior to such termination. Waiver by Bess Eaton of any particula default or action by or against the Franchised Retailer shall not affect Bess Eaton's rights in respect to any subsequent default or action giving rise to an election by Bess Eaton pursuant to this Paragraph.

(b) Notwithstanding the foregoing, nothing in this Agreement shall be construed to permit Bess Eaton to terminate

the Franchised Retailer's rights hereunder in the event of a merger, consolidation, dissolution or sale of substantially all of the Franchised Retailer's assets, provided such transaction does not prevent the Franchised Retailer or its successsors fror continuing its business at the Premises, and provided that both the original Franchised Retailer together with its individual guarantors and its successor shall guarantee continued performance and compliance with this Agreement.

(c) For purposes of this Agreement, a party shall not be deemed to be in default of any of its obligations under this Agreement unless and until it shall have received written notice by certified mail specifying such claimed default, and shall hav failed to cure such default within fourteen (14) days after receipt of such notice. If a default shall not be capable of beir cured within fourteen (14) days (other than a default for nonpayment of any sums due hereunder), it shall be deemed cured if corrective action is begun within said fourteen (14) day period and is pursued diligently to completion.

15. Term of Agreement. This Agreement shall remain in force and effect for three (3) years from the date hereof and shall thereafter be automatically extended for successive three (3) year terms, provided, however, that either party may terminate this Agreement at the end of the original term, or at the end of any such renewal term, by notice in writing sent to the other party not less than two (2) months prior to the expiration date of such term. Bess Eaton's right to terminate this Agreement may be exercised only if permitted in accordance with Connecticut law.

16. Benefit and Assignment. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Bess Eaton. Except as otherwise provided in this Agreement, the interest of the Franchised Retailer in this Agreement shall not be assigned, transferred, shared or divided in any manner by the Franchised Retailer without the prior written consent of Bess Eaton. It is understood and agreed that the shares of capital stock of the Franchised Retailer shall not be sold, pledged, donated, assigned or transferred so as to change the controlling interest therein without the prior written consent of Bess Eaton, provided, however, that Bess Eaton hereby consents to the transfers of part or all of the stock of the Franchised Retailer to or for the benefit of James V. Serruta, son of James Serruta.

17. Prior Agreements. This Agreement supersedes and renders null and void all prior agreements among or between the parties, or any of them, relating to the subject of a franchise for the sale of doughnuts under the name "Bess Eaton".

18. Applicable Law. This Agreement shall be governed by and construed in accordance with the law of the State of Connecticut.

19. Arbitration. Any dispute whatsoever relating to the interpretation, validity or performance of this Agreement, or any other dispute arising out of this Agreement which cannot be resolved by the parties thereto upon thirty (30) days written notice by any party, shall be settled by arbitration in the City of

Norwich, Connecticut, in accordance with the rules then prevailing of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any cou of competent jurisdiction. It is the purpose of this Agreement, and the intent of the parties hereto, to make the submission to arbitration of any dispute or controversy arising out of this Agreement an express condition precedent to any legal or equitat action or proceeding of any nature whatsoever. The cost of any arbitration proceeding under this Paragraph shall be shared equa ly by the parties to such a dispute.

20. Consent. Wherever the consent or approval of a party is required hereunder, such consent or approval shall not be unreasonably withheld.

21. Territory; Additional Locations. In the event that Bess Eaton intends to grant a new franchise (which includes a Bess Eaton-owned store) within a territory having a radius of one mile from the Premises of the Franchised Retailer, the Franchised Retailer (sometimes hereinafter referred to as the "initial Franchised Retailer") shall be given the right of first refusal in respect thereto. Said intention shall be communicate to the Franchised Retailer by Bess Eaton in writing in sufficien detail so that the Franchised Retailer may reasonably evaluate the opportunity. The Franchised Retailer shall have thirty (30) days after receipt of the aforesaid written communication within which to accept the new franchise to be granted within the said territory. If the Franchised Retailer shall timely accept said new franchise, it will proceed with diligence and use its best efforts to open the new location within the next six (6) months. In the event the Franchised Retailer shall fail to timely accept said new franchise, or shall fail to proceed with diligence and use its best efforts to open the new location within the next six (6) months, Bess Eaton shall be free to grant the new franchise within the said territory to any other franchised

retailer of its choice (including Bess Eaton itself for a Bess Eaton-owned store) (hereinafter referred to as the "second franchised retailer"). In the event that Bess Eaton desires to grant a further franchise within said territory the initial Franchised Retailer shall have no right of first refusal. Rather, the above described right of first refusal shall apply solely to the second franchised retailer and shall be operative as if the second franchised retailer were the initial Franchised Retailer. The Franchised Retailer shall have the exclusive right to open additional locations in the Town in which it is now located, provided such additional locations are approved by Bess Eaton. Such additional locations, if approved, shall become subject to the terms of this Agreement in the same manner as if originally described herein.

22. Guarantee. James Serruta and James V. Serruta here jointly and severally guarantee full performance of and complian with all the terms and conditions of this Agreement, including payment of all sums due hereunder by and from the Franchised Retailer.

IN WITNESS WHEREOF, the parties have hereunto set their han and seals, the corporate parties acting by their duly authorized officers, the day and year first written above.

BESS EATON DONUT FLOUR COMPANY, INCORPORATED

By [signature]
Title:

BESS EATON OF NEW BRITAIN, INC.

By [signature]
Title: President

James Serruta (LS)

James V. Serruta (LS)

FRANCHISE AGREEMENT

AGREEMENT made this 22 day of July, 1983, by and between BESS EATON DONUT FLOUR COMPANY, INCORPORATED, a Connecticut corporation having its principal place of business in the State of Rhode Island (hereinafter referred to as "Bess Eaton") and BESS EATON OF NEW BRITAIN, INC., a Connecticut corporation having its principal place of business at 876 West Main Street, New Britain, Connecticut (hereinafter referred to as "Franchised Retailer");

WHEREAS, Bess Eaton has developed and obtained knowledge and a high degree of experience in the fields of production, merchandising, distribution and promotion of the sale of doughnuts, doughnut flour and related products and has established a valuable reputation, demand and good will for said products under the name "Bess Eaton Donuts", which has come to signify the highest standards of management, supervision, merchandising and quality; and

WHEREAS, the Franchised Retailer and Bess Eaton have been in a franchisor-franchisee relationship pursuant to a certain franchise agreement dated October 29, 1969; and

WHEREAS, the parties have reached agreement on certain changes regarding their franchise relationship and wish to reduce such agreement to writing;

NOW, THEREFORE, in consideration of the premises and the covenants and conditions hereinafter set forth, the parties covenant and agree as follows:

1. Grant of Franchise. Bess Eaton hereby gives and grants to the Franchised Retailer the exclusive right to engage, pursuant

to the terms hereof, in the business of producing and selling doughnuts and related products under the name "Bess Eaton Donuts within a territory more particularly described in Paragraph 21 below, and in particular at the following location: 876 West Main Street, New Britain, Connecticut (hereinafter sometimes referred to as the "Franchised Retailer's Premises" or "the Premises"). In the event that the Franchised Retailer's lease of the premises at 876 West Main Street, New Britain, Connecticu shall terminate for any reason, then the Franchised Retailer sha have the right to select a new location within the territory described in Paragraph 21 below, and such new location shall be deemed to be the "Franchised Retailer's Premises" or the "Premis for purposes of this Agreement.

2. <u>Purchase of Materials, Products and Supplies</u>.

(a) The Franchised Retailer shall purchase from Bess Eaton, or from such sources as shall be approved in writing by Bess Eaton, all doughnut flours (other than French and whole whe. flour), shortenings, fillings and jellies used in the production of "Bess Eaton Donuts" and all coffee and tea sold by the Franchised Retailer as "Bess Eaton" coffee or tea. Bess Eaton agrees to supply the Franchised Retailer with its requirements of such items, or to designate and approve other sources thereof. It is expressly understood and agreed that the foregoing agreement of the Franchised Retailer is for the sole purpose of maintaining the distinctive, exclusive and unique character, quality and taste of "Bess Eaton" Donuts and "Bess Eaton" coffee and tea without which the within grant of franchise would be of only nominal value to the Franchised Retailer, it being understood that each other franchised retailer similarly shall agree to purchase the items identified in this subparagraph (a) from Bess Eaton, or from such sources as shall be approved in writing by Bess Eaton, to the end that each Bess Eaton franchised retaile

shall be serving and selling "Bess Eaton" Donuts and "Bess Eator coffee or tea of the same distinctive, exclusive and unique character, quality and taste. The items to which this subparagraph (a) applies are designated on Exhibit A attached hereto by singl asterisks (*) in the left margin thereof.

(b) With respect to any product, supplies, equipment or raw materials required in the conduct of the business of the Franchised Retailer (other than that governed by subparagraph (a above), the Franchised Retailer is under no obligation to purcha the same from Bess Eaton or from sources supplied by Bess Eaton long as all such products, supplies, equipment and raw materials purchased from any other source reasonably conform to Bess Eaton established specifications and standards, if any, as to quality, size, appearance and design thereof. It is the purpose of such specifications and standards to ensure high standards of quality for each franchised retailer and also to achieve reasonable uniformity among all franchised retailers, it being understood that uniformity in quality, size, appearance and design is an essentia element in the success of every franchise business serving the consuming public on a volume basis. Bess Eaton will promptly furnish such standards and specifications to a potential supplier upon written request of the Franchised Retailer or of a potential supplier.

3. Price of Materials, Products and Supplies.

(a) The prices to be charged to the Franchised Retaile by Bess Eaton pursuant to Paragraph 2 above shall be those prices which are in force and effect from time to time in respect to the same items purchased by other franchised retailers from Bess Eato (subject to subparagraph (c) below). A copy of the price list in effect at the time of the signing of this Agreement is annexed hereto and made a part hereof as Exhibit A. Bess Eaton agrees to

give the Franchised Retailer prompt written notice of any chang in such prices.

(b) The Franchised Retailer agrees to use its best efforts, insofar as practicable, to give Bess Eaton advance ora or written notice of the Franchised Retailer's intention or dec sion to discontinue indefinitely or permanently purchasing cert Paragraph 2(b) items from sources other than Bess Eaton. The items to which this subparagraph (b) applies are designated on Exhibit A by a double asterisk (**) in the left hand margin. I is understood and agreed that the Franchised Retailer's purchas such items from outside sources from time to time, but without decision or the intention to discontinue indefinitely or permanently purchasing such items from Bess Eaton, shall not be construed to be a breach of the Franchised Retailer's obligations under this subparagraph.

(c) Notwithstanding the foregoing, if and when the Franchised Retailer (including, for this purpose, James Serruta and James V. Serruta) owns or controls certain numbers of locations, Bess Eaton agrees to give the Franchised Retailer a discount on purchases of items described in Paragraph 2(a) and (b) above from Bess Eaton (other than equipment or utensils) as follows:

| Number of Locations | Percentage Discount |
|---|---|
| 5-7 | 1% |
| 8-9 | 1 1/2% |
| 10-11 | 2% |
| 12 or more | 2 1/2% |

provided that payment for such purchases is made within fourteen (14) days after delivery, and provided further that the purchaser is not, at the time of delivery, in default of its obligations pursuant to this Agreement (in accordance with the terms of Paragraph 14 below). Bess Eaton hereby states its intent to afford similar such discounts to any other franchised retailer owning or controlling similar numbers of locations.

4. Excusable Delay. No party shall be liable for any delay in the performance of its obligations under this Agreement (other than to make timely payment of any sums due hereunder) if such delay shall be due to any cause beyond the reasonable contr of such party. In the event of such a delay on the part of Bess Eaton in delivering any equipment, products or merchandise, it shall designate alternative sources for such items.

5. Standards of Service and Appearance. During the term of this Agreement, the Franchised Retailer shall conform to Bess Eaton's standards of service in connection with the conduct of the Franchised Retailer's business and standards respecting the physical appearance of the Premises, provided such standards are uniformly applied to and enforced against all "Bess Eaton" locations, whether franchised or not. Bess Eaton may inspect the operation of the Franchised Retailer's business at the Premises for the purpose of determining compliance with this Paragraph.

6. Accounting. Bess Eaton shall advise the Franchised Retailer of the uniform system of accounts in effect from time to time in respect to all "Bess Eaton" locations, whether franchased or not, and shall initially supply instruction in establishing and maintaining such system of accounts. The Franchised Retailer shall provide Bess Eaton with a weekly report of Gross Sales (as hereinafter defined) on or before Tuesday of each week for the seven (7) day period ending at the close of business on Wednesday of the previous week. The Franchised Retailer shall utilize cash registers which accumulate sales, which register all sales, and which have no resetting devices. Bess Eaton may inspec the books and records of the uniform system of accounts pertaining to Gross Sales upon reasonable advance notice during business hour as may be necessary or advisable in the reasonable judgment of officials of Bess Eaton. Bess Eaton agrees to hold any information obtained from the Franchised Retailer in strict confidence.

7. Payment by Franchised Retailer. In consideration of the rights granted herein to the Franchised Retailer, the Franchised Retailer shall pay to Bess Eaton each calendar year, or part thereof, during the term of this Franchise Agreement, a sum equal to two percent (2%) of the Franchised Retailer's Gross Sales at the Premises. For purposes of this Agreement, "Gross Sales" shall not include sales taxes or other taxes of a similar nature, nor sales of cigarettes or other tobacco products. The Franchised Retailer shall make available for reasonable inspectic by Bess Eaton personnel all original books and records that Bess Eaton may determine to be necessary or advisable to record and ascertain "Gross Sales". The Franchised Retailer shall remit to Bess Eaton the sum due pursuant to the terms of this Paragraph 7 promptly after receipt by it of a monthly statement therefor issued by Bess Eaton. Notwithstanding the foregoing, this Paragraph shall not apply to Gross Sales at the Premises at 876 West Main Street, New Britain, Connecticut, nor at any new location substituted pursuant to Paragraph 1 above.

8. Restrictions. It is understood and agreed that Bess Eaton has granted the within franchise to the Franchised Retailer in part because of the suitability of the site in which the Franchised Retailer conducts its business. Therefore, the Franchised Retailer hereby agrees that it shall not, during the term of this Agreement, sell, lease, transfer, convey, assign or sublease the Premises or any part thereof or interest therein without in each instance first giving prior written notice to Bess Eaton of its intent to enter into such a transaction. No such notice shall be necessary with respect to a bona fide mortgage or similar encumbrance on the Premises in favor of a bank or other financial institution. It is agreed that the damages which would be suffered by Bess Eaton in the event of the breach by the Franchised Retail of its obligations under this Paragraph would be considerable,

although the amount cannot be accurately determined. Therefore, it is agreed that in the event of such a breach which results in the Franchised Retailer's inability to continue operations at th Premises during the term of this Agreement, the Franchised Retai er shall pay to Bess Eaton the cash sum of Ten Thousand Dollars ($10,000) which, it is mutually agreed, shall constitute liquidated damages in a reasonable amount and not a penalty. It is further agreed that the Franchised Retailer's inability to continue to operate at a location because of a lease termination wi third party landlords shall not be deemed to be a breach of this Paragraph.

9. Best Efforts. The Franchised Retailer agrees to exer its best efforts to establish and increase sales of products sol by it under the trade name "Bess Eaton Donuts" and shall, subjec to all of the terms of this Agreement, maintain at all times a sufficient supply of said products.

10. Personnel. All personnel employed by the Franchised Retailer shall comply with uniform standards of sanitation, clea liness and demeanor as may be established by Bess Eaton and appl able to all Bess Eaton locations, whether franchised or not. In the event any employee performs work which in the opinion of Bess Eaton and the Franchised Retailer requires special skill or knowl edge, said employee shall be specially trained at the direction and expense of Bess Eaton. Any personnel receiving such special training (other than any party hereto) shall execute non-competitive contracts if required by Bess Eaton. Failure to do so promptly shall permit Bess Eaton to terminate the Agreement on ten (10) days notice to the Franchised Retailer.

11. Advertising.

(a) The Franchised Retailer shall pay to Bess Eaton with respect to each calendar year, or part thereof, during which

this Franchise Agreement is in force a sum equal to one-half of one percent (1/2%) of the Franchised Retailer's Gross Sales at the Premises, payable as provided in Paragraph 7 above. Bess Eaton hereby agrees to utilize all sums received from its Franchised Retailers pursuant to this Paragraph (or its counterpart or counterparts in other franchise agreements) solely in connection with advertising the products, name, trade marks and good will which are the subject of this Franchise Agreement. The character, frequency, media and all other aspects of such advertising shall be determined solely by Bess Eaton inasmuch as it is contemplated that the emphasis of such advertising shall be institutional in nature rather than intending to benefit any particular Franchised Retailer or group of franchised retailers. Bess Eaton agrees to give each franchised retailer, annually, an accounting of where and how said sums were expended. It is contemplated and expected that in addition to the aforesaid institutional advertising, individual franchised retailers, at their own expense, will advertise with respect to their specific franchised business operation.

(b) All advertising by the Franchised Retailer, which is materially and substantially different from that heretofore used by it, shall be submitted in writing to Bess Eaton for its approval. Unless rejected in writing by Bess Eaton within seven (7) days after receipt, such advertising shall be deemed to be approved.

12. Insurance. The Franchised Retailer shall maintain in effect during the term of this Agreement with insurance companies licensed by the State of Connecticut insurance, in such amounts as the Franchised Retailer shall reasonably determine, for the benefit of Bess Eaton (as well as for the benefit of the Franchised Retailer) covering comprehensive public liability. The

Franchised Retailer shall supply Bess Eaton with certificates of such insurance and shall promptly pay the premiums on said policies as and when the same become due. The Franchised Retailer hereby agrees to indemnify and hold Bess Eaton harmless from and against any and all claims, demands, charges and losses arising out of the conduct by the Franchised Retailer of its operations pursuant to or in violation of this Agreement. Bess Eaton agree to indemnify and hold the Franchised Retailer harmless from and against any and all claims, demands, charges and losses arising out of the conduct by Bess Eaton of its business or the manufacture or handling by it of its products.

13. Ownership of Trade Name and Trade Mark. The Franchis[illegible] Retailer hereby acknowledges the validity of and the ownership i[illegible] Bess Eaton of the trade name "Bess Eaton Donuts" and "Bess Eaton and any trade marks, designs and advertising in any way related thereto, and agrees that upon termination of this Agreement for whatever cause the permission to use the same pursuant hereto an[illegible] all interest of the Franchised Retailer therein shall terminate automatically.

14. Termination by Bess Eaton.

(a) If a petition in bankruptcy shall be filed by the Franchised Retailer or against the Franchised Retailer and not discharged in thirty (30) days, or a receiver shall be appointed for its property or affairs, or if the Franchised Retailer shall make an assignment for the benefit of creditors, or (except as hereinafter provided) shall merge, consolidate, dissolve or sell substantially all of its assets, or shall be in default of its obligations hereunder, then Bess Eaton may terminate this Agreement upon notice in writing to the Franchised Retailer, and upon receipt of such notice by the Franchised Retailer, this Agreement and all rights of the Franchised Retailer hereunder shall terminate automatically but such termination shall not affect the obli-

gations of the Franchised Retailer arising out of this Agreeme prior to such termination. Waiver by Bess Eaton of any partic default or action by or against the Franchised Retailer shall affect Bess Eaton's rights in respect to any subsequent defaul or action giving rise to an election by Bess Eaton pursuant to this Paragraph.

(b) Notwithstanding the foregoing, nothing in this Agreement shall be construed to permit Bess Eaton to terminate the Franchised Retailer's rights hereunder in the event of a merger, consolidation, dissolution or sale of substantially al of the Franchised Retailer's assets, provided such transaction does not prevent the Franchised Retailer or its successsors frc continuing its business at the Premises, and provided that both the original Franchised Retailer together with its individual guarantors and its successor shall guarantee continued performance and compliance with this Agreement.

(c) For purposes of this Agreement, a party shall nc be deemed to be in default of any of its obligations under this Agreement unless and until it shall have received written notic by certified mail specifying such claimed default, and shall ha failed to cure such default within fourteen (14) days after receipt of such notice. If a default shall not be capable of bei cured within fourteen (14) days (other than a default for nonpayment of any sums due hereunder), it shall be deemed cured if corrective action is begun within said fourteen (14) day period and is pursued diligently to completion.

15. Term of Agreement. This Agreement shall remain in force and effect for three (3) years from the date hereof and shall thereafter be automatically extended for successive three (3) year terms, provided, however, that either party may terminate this Agreement at the end of the original term, or

at the end of any such renewal term, by notice in writing sent to the other party not less than two (2) months prior to the expiration date of such term. Bess Eaton's right to terminate this Agreement may be exercised only if permitted in accordance with Connecticut law.

16. Benefit and Assignment. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Bess Eaton. Except as otherwise provided in this Agreement, the interest of the Franchised Retailer in this Agreement shall not be assigned, transferred, shared or divided in any manner by the Franchised Retailer without the prior written consent of Bess Eaton. It is understood and agreed that the shares of capital stock of the Franchised Retailer shall not be sold, pledged, donated, assigned or transferred so as to change the controlling interest therein without the prior written consent of Bess Eaton, provided, however, that Bess Eaton hereby consents to the transfers of part or all of the stock of the Franchised Retailer to or for the benefit of James V. Serruta, son of James Serruta.

17. Prior Agreements. This Agreement supersedes and renders null and void all prior agreements among or between the parties, or any of them, relating to the subject of a franchise for the sale of doughnuts under the name "Bess Eaton", including but not limited to the franchise agreement between Bess Eaton and James Serruta dated October 29, 1969.

18. Applicable Law. This Agreement shall be governed by and construed in accordance with the law of the State of Connecticut.

19. Arbitration. Any dispute whatsoever relating to the interpretation, validity or performance of this Agreement, or any other dispute arising out of this Agreement which cannot be re-

solved by the parties thereto upon thirty (30) days written not: by any party, shall be settled by arbitration in the City of Norwich, Connecticut, in accordance with the rules then prevailing of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any cour of competent jurisdiction. It is the purpose of this Agreement, and the intent of the parties hereto, to make the submission to arbitration of any dispute or controversy arising out of this Agreement an express condition precedent to any legal or equitat action or proceeding of any nature whatsoever. The cost of any arbitration proceeding under this Paragraph shall be shared equa ly by the parties to such a dispute.

20. Consent. Wherever the consent or approval of a party is required hereunder, such consent or approval shall not be unreasonably withheld.

21. Territory; Additional Locations. In the event that Bess Eaton intends to grant a new franchise (which includes a Bess Eaton-owned store) within a territory having a radius of one mile from the Premises of the Franchised Retailer, the Franchised Retailer (sometimes hereinafter referred to as the "initial Franchised Retailer") shall be given the right of first refusal in respect thereto. Said intention shall be communicated to the Franchised Retailer by Bess Eaton in writing in sufficient detail so that the Franchised Retailer may reasonably evaluate the opportunity. The Franchised Retailer shall have thirty (30) days after receipt of the aforesaid written communication within which to accept the new franchise to be granted within the said territory. If the Franchised Retailer shall timely accept said new franchise, it will proceed with diligence and use its best efforts to open the new location within the next six (6) months. In the event the Franchised Retailer shall fail to timely accept said new franchise, or shall fail to proceed with diligence and use its best efforts to open the new location within the next six (6) months, Bess Eaton shall be free to grant the new franchise within the said territory to any other franchised

retailer of its choice (including Bess Eaton itself for a Bess Eaton-owned store) (hereinafter referred to as the "second franchised retailer"). In the event that Bess Eaton desires to grant a further franchise within said territory the initial Franchised Retailer shall have no right of first refusal. Rather, the above described right of first refusal shall apply solely to the second franchised retailer and shall be operative as if the second franchised retailer were the initial Franchised Retailer. The Franchised Retailer shall have the exclusive right to open additional locations in the Town in which it is now located, provided such additional locations are approved by Bess Eaton. Such additional locations, if approved, shall become subject to the terms of this Agreement in the same manner as if originally described herein.

22. <u>Guarantee</u>. James Serruta and James V. Serruta hereby jointly and severally guarantee full performance of and compliance with all the terms and conditions of this Agreeme including payment of all sums due hereunder by and from the Franchised Retailer.

IN WITNESS WHEREOF, the parties have hereunto set their han and seals, the corporate parties acting by their duly authorized officers, the day and year first written above.

BESS EATON DONUT FLOUR COMPANY, INCORPORATED

By ____________________
Title:

BESS EATON OF NEW BRITAIN, INC.

BY ____________________
Title:

____________________ (LS)
James Serruta

____________________ (LS)
James V. Serruta

REC'D
DEC 16 2004
MacADAMS
COPY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re: BESS EATON DONUT FLOUR CO., INC., Debtor | Chapter 11 Case No. 04-10630 |
| In re: LOUIS A. GENCARELLI, SR., Debtor | Chapter 11 Case No. 04-10682 (Jointly Administered) |

SUPPLEMENT TO MOTIONS OF DEBTOR, LOUIS A. GENCARELLI, SR. FOR AUTHORITY TO RELEASE A PORTION OF EXCESS SALES PROCEEDS AND FOR EXPEDITED HEARING

Debtor, Louis A. Gencarelli, Sr. (the "Debtor") has moved this Court for an order authorizing the Debtor to release a portion of "excess" sales proceeds to him. The Debtor has also moved this Court for an expedited hearing on the motion. The Debtor now supplements both motions with the following additional information in order to assist the Court in granting the motions:

1. The cash on hand in the Debtor's estate is currently approximately $7,566,000.

2. The Debtor's estate has reserves in place for disputed and unresolved prepetition claims in the amount of approximately $425,000.

3. After giving effect to the distribution requested in the amount of $2,500,000 and after subtracting the reserves, the Debtor's estate will have cash on hand in the amount of approximately $4,641,000.

EXHIBIT D

4. Professional fees and other administrative expenses to be charged against the Debtor's estate or the estate of Bess Eaton Donut Flour Co., Inc. ("Bess Eaton"; Debtor and Bess Eaton, collectively, "Debtors"), to the extent allowed by the Court, are projected not to exceed approximately $1,750,000 in total, leaving a balance in the Debtor's estate of approximately $2,891,000.

5. The Debtor understands that Tim Hortons (New England), Inc. ("Tim Hortons") believes that it may have claims against the Debtor's estate, and Debtors believe that they may have a claim against Tim Hortons; the relief sought by the abovementioned motions is to be without prejudice to the claims of Tim Hortons and Debtors. Apart from any claims that Tim Hortons might have, the abovementioned disputed claims, and the abovementioned administrative claims for professional fees and administrative expenses, the Debtor is not aware of any other outstanding claim against the Debtor's estate or Bess Eaton's estate, prepetition, administrative or otherwise.

Date: December 15, 2004

LOUIS A. GENCARELLI, SR.

By His Attorneys,
FERRUCCI RUSSO P.C.

By Joseph P. Ferrucci /gma
Joseph Ferrucci, Esq. (#4231)
55 Pine Street
Providence, RI 02903
(401) 455-1000
(401)-455-7778 - Fax

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - x
In re: :

LOUIS A. GENCARELLI, SR. : BK No. 04-10682
Debtor Chapter 11
:
- - - - - - - - - - - - - - - - x

**ORDER OVERRULING OBJECTION TO REQUEST FOR AUTHORITY TO RELEASE FUNDS**

Heard on the Debtor, Louis A. Gencarelli's motion to release $2.5 million of the excess sales proceeds in this case, to pay substantial tax liabilities that are accruing interest and penalties. Secured creditors 1800 Smith Street Associates and 1500 Mineral Spring Associates, LP object to the request. The Debtor points out that with over $7.5 million on hand, after distribution of the requested $2.5 million, and taking into account a reserve fund for disputed creditor claims (including the Objectors), there will still be more than $4.6 million on hand. Based upon the arguments and the entire record in this case, the motion is GRANTED ON CONDITION that the Debtor forthwith pay $2.4 million to state and federal taxing creditors as represented in the affidavit of Charles L. Germany. The Debtor is ORDERED to file proof of such payment within 30 days.

Dated at Providence, Rhode Island, this 29th day of December, 2004.

Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on Docket: 12/29/04

Judgment#:1:04-bk-10682-312-286

EXHIBIT
E

Case Number: 04-10682 Form: pdfdoc Notice Date: 12/31/2004 

TO THE DEBTOR/DEBTOR'S ATTORNEY:

A copy of this notice could not be mailed to each creditor listed below because the court does not have both a city and state for the creditor or, if being mailed to a foreign country, both a city and country. Immediately contact the court in writing if you believe it failed to properly add to its database all of the addresses you provided in your mailing matrix. Please be advised that a creditor's failure to receive some notice of your case could mean the debt owed to that creditor may not be discharged (debtor should contact their attorney with questions).

IMPORTANT NOTE: YOU MUST SEND A COPY OF THIS NOTICE TO THE CREDITORS LISTED BELOW. THE COURT WILL NOT MAIL THIS NOTICE AGAIN.

For future notices, to correct a creditor's address listed below you must:

(1) Cross out all incorrect information on this page and clearly insert all updated information; (2) Date and sign in the space provided on the bottom of this form; AND (3) Immediately return this page to the court.

IMPORTANT NOTE: YOU MUST ALWAYS INCLUDE ANY ALPHABETIC OR NUMERIC CODE LOCATED TO THE LEFT OF THE CREDITOR'S NAME WHEN CONTACTING THE COURT TO CORRECT A CREDITOR'S ADDRESS!

IMPORTANT NOTE: WHILE YOU MAY CORRECT A CREDITOR'S ADDRESS USING THE ABOVE INSTRUCTIONS, IT IS IMPORTANT TO NOTE THAT, IF YOU WISH TO AMEND YOUR SCHEDULES TO ADD A PREVIOUSLY UNLISTED CREDITOR, YOU MUST CONTACT THE COURT FOR INSTRUCTIONS. LISTING SUCH A CREDITOR ON THIS PAGE IS INSUFFICIENT, AND WILL NOT RESULT IN THE CREDITOR BEING ADDED.

The list of each recipient who was not mailed a copy of this notice, including the portion of the address contained in the court's database for the creditor, is as follows:

| | |
|---|---|
| cr | UPS Capital Business Credit |
| intp | BE Network Acquisition, LLC |
| cr | George Cioe |
| cr | Washington Trust Company (The) |
| intp | Tim Hortons (New England), Inc. |
| cr | First Trade Union Bank |
| cr | Sara Lee Coffee & Tea Foodservice |
| cr | Narragansett Electric Company |
| cr | New England Gas Company |
| intp | Lorraine Randall |
| intp | H. Douglas Randall, III |
| cr | Rockville Bank |
| cr | Aurora Loan Services, Inc. |
| cr | Frances G. Kirchon |
| cr | Angelo A. Gencarelli, III |
| crcm | Creditors' Committee |
| intp | Town of Coventry |
| cr | Chelsea Groton Savings Bank |
| intp | Narragansett Pier Associates |
| cr | Narragansett Bay Commission |
| cr | Town of Stonington |
| cr | Jason's Realty Corp. |
| cr | 1800 Smith Street Associates LP |
| cr | 1500 Mineral Spring Associates LP |
| intp | Sovereign Bank, Network Capital Alliance Division |
| cr | Despina Matsas |

Case Number: 04-10682 Form: pdfdoc Notice Date: 12/3 Page 2004 2

| | |
|---|---|
| cr | Christ Matsas |
| cr | Randolph Savings Bank |
| cr | Eastern Bank |
| cr | DaimlerChrysler Services North America LLC |
| intp | Bess Eaton Donut Flour Company Incorporated |
| cr | R.I. Green, Inc. |
| cr | Volvo Finance North America, Inc. |
| cr | Charles S. Sokoloff Incorporated |
| cr | Charles S. Sokoloff |

Date

Debtor/Debtor's Attorney