UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

1500 MINERAL SPRING ASSOCIATES, LP
        Appellant,

        v.                                C.A. No. 04-496T

LOUIS A. GENCARELLI, SR.,
et al.,
        Appellees;


1800 SMITH STREET ASSOCIATES, LP
        Appellant,

        v.                                C.A. No. 05-09T

LOUIS A. GENCARELLI, SR.,
et al.,
        Appellees;


1800 SMITH STREET ASSOCIATES, LP
        Appellant,

        v.                                C.A. No. 05-10T

LOUIS A. GENCARELLI, SR.,
et al.,
        Appellees.

## OPINION AND ORDER

ERNEST C. TORRES, Chief Judge.

## Introduction

    1500 Mineral Spring Associates, LP ("Mineral Spring"), 1800

Smith Street Associates, LP ("Smith Street"), and their general

partner, Jason's Realty Corp. ("Jason's")(collectively, the

"appellants") have appealed from three orders by the Bankruptcy

Court.  The first order denied the appellants' motion to dismiss

the individual Chapter 11 petition of Louis A. Gencarelli, Sr. ("Gencarelli") for lack of good faith; the second order limited the appellants' claims for past and future rent to the amount provided by 11 U.S.C. §502(b)(6); and the third order authorized an interim distribution of $2.5 Million to Gencarelli from the bankruptcy estate.  Because the appeals raise overlapping issues, they have been consolidated.[1]

For the reasons hereinafter stated, the orders denying the motion to dismiss Gencarelli's petition and establishing the amount that the appellants are entitled to recover under Section 502(b)(6) are vacated and the case is remanded to the Bankruptcy Court for further proceedings with respect to those matters, but the order authorizing the interim distribution is affirmed.

## Background Facts

Gencarelli was the sole shareholder of Bess Eaton Donut Flour Company, Inc. ("Bess Eaton") which operated forty-eight doughnut shops doing business under the name Bess Eaton.  Some of the shops were located on real estate owned by Gencarelli which he leased to them.  Other shops were located on real estate that Gencarelli leased from third parties and subleased to the shops.

On November 5, 1999, Gencarelli agreed to lease two parcels of property in North Providence from Mineral Spring and Smith

---

[1] The plaintiffs also have appealed an order authorizing another disbursement.  That appeal has not been consolidated with the other three appeals.

Street, respectively.   Gencarelli planned to sub-lease those parcels to Bess Eaton after doughnut shops had been built on them.   The Mineral Spring and Smith Street leases were for twenty year terms beginning on November 1, 1999.   Rental payments were to begin on the earlier of March 1, 2000, or when the doughnut shops opened for business, and they included as "additional rent" reimbursement to the lessors for taxes, insurance costs, and other expenses that they incurred.[2]   The Mineral Spring lease called for a "minimum base rent" of $3,500 per month and the Smith Street lease called for a "minimum base rent" of $3,000 per month, but those amounts were subject to adjustment every five years.

On February 29, 2000, after Gencarelli encountered delays in obtaining the necessary construction permits and regulatory approvals, he declared the leases null and void and stopped making payments.

The appellants, then, brought a "trespass and ejectment" action  against Gencarelli in the Rhode Island District Court seeking possession of the premises and recovery of past and future rent.   Shortly thereafter, Gencarelli sued the appellants in the Rhode Island Superior Court seeking a declaratory judgment

---

[2] Pursuant to Section 1.a. of the Mineral Spring lease, Gencarelli was also required to reimburse the appellants for $7,800 in demolition costs.

regarding the parties' rights and duties under the leases.

On April 19, 2000, Gencarelli and the appellants signed identical stipulations in the two District Court suits. The stipulations provided:

> By agreement of the parties, it is hereby acknowledged and understood that Defendant Loius [sic] A. Gencarelli, Sr. does not have and is **not** entitled to possession of the "Demised Premises" located in North Providence, Rhode Island, as that term is more fully described in the commercial Absolute Triple Net Bonded Land Lease dated November 1, 1999 between the parties. (emphasis in original)

On June 15, 2000, the District Court entered judgments awarding $18,300 plus attorney's fees of $3,750 to Mineral Spring and $ 11,369.73 plus attorney's fees of $3,750 to Smith Street. Interest and costs were added to both judgments. Gencarelli appealed both judgments to the Superior Court, which consolidated the appeals with Gencarelli's declaratory action.

In February 2004, Gencarelli began negotiating to sell all of Bess Eaton's assets and the real estate that he leased to the doughnut shops to Tim Hortons, Inc. ("Hortons"). Hortons offered to pay $6,612,698 for Bess Eaton's assets and $28,476,350 for the real estate owned by Gencarelli but the offer was conditioned on Gencarelli and Bess Eaton filing Chapter 11 petitions no later than March 2, 2004, in order to ensure that the assets would not be subject to any encumbrances. In persuading Bess Eaton's creditors to go along, Gencarelli agreed to personally guarantee

4

full payment of all unsecured claims against Bess Eaton that were allowed by the Bankruptcy Court.

Bess Eaton filed its Chapter 11 petition on March 1, 2004 and Gencarelli filed his petition on March 3, 2004. Gencarelli's petition reported assets of $30,788,278.80 and liabilities of $30,438,937.48, which included $2,112,256.10 potentially due under his personal guaranty. Bess Eaton's petition reported assets of approximately $9,700,000 and debts of approximately $17,600,000. Appellants' Exhibit 3.

On March 16, 2004, the Bankruptcy Court conducted an evidentiary hearing to determine whether the assets of Bess Eaton and Gencarelli should be sold; and, if so, what procedure should be followed. Leland Goldberg, Bess Eaton's interim CEO, testified that Bess Eaton "was in very difficult financial straights [sic]", (Transcript of March 16, 2004 hearing at 17), and that the company "lost approximately $5 million" during the previous two years. Id. at 18. Goldberg agreed that bids from other prospective buyers such as Dunkin' Donuts should be considered, id. at 26, and he described Horton's bid as a "stalking horse" which provided a $35 million base price that other bidders had to beat. Id. at 29. Goldberg also expressed concern that Horton's offer might be lost if the sale could not be consummated by May 3, 2004, (id. at 171-72), a concern that

5

was shared by the creditors' committee. Id. at 198.

Counsel for Hortons told the bankruptcy judge that the $35 million sales price was a "non-bankruptcy deal price," sufficient to "get all creditors paid." Id. at 239. He also explained that a May 3, 2004 deadline in Horton's offer was based on its concern that Bess Eaton was a "troubled asset that's been failing." Id. at 242.

The Bankruptcy Court administratively consolidated the Bess Eaton and Gencarelli bankruptcy cases and, on March 18, 2004, it issued a written order approving the auction sale of the assets of both debtors based on "all of the proceedings had before the Court; and after due deliberation and sufficient cause." March 18, 2004 Order Approving Bid and Auction Procedure.

Shortly thereafter, the first meeting of creditors (the "341 meeting") was held and Gencarelli was questioned at length about his assets and liabilities. Gencarelli's counsel stated that Gencarelli was three months behind in making mortgage and property tax payments on several of the real estate parcels leased to Bess Eaton because he had not received rental payments from the doughnut shops occupying those properties, (Transcript of March 31, 2004 Hearing at 28), and Gencarelli stated that all of his income was derived from rents received from Bess Eaton. Id. at 52-53. Gencarelli also stated that his net income was $1.4

6

million in 2002 and $878,000 in 2003, and that his gross income
for the first three months of 2004 was $422,000. Id. at 56-57.
Furthermore, Gencarelli confirmed that his monthly income, at the
time, was $24,150, as reported on Schedule I of his Chapter 11
petition, and that his monthly expenses were $31,658.25, (id. at
87), but that amount included charitable contributions of
$10,000. In response to questioning by the trustee, Gencarelli
stated that his wife would pay his excess expenses from her own
assets. Id. at 87-88. Beyond those statements, very little
information was provided with respect to Gencarelli's financial
condition.

In describing Gencarelli's "reorganization plan,"
Gencarelli's counsel expressed the belief that Hortons' $36
million offer and the competitive bidding that it would generate
would produce an amount sufficient to pay all of Bess Eaton's and
Gencarelli's creditors, in full, and to establish an escrow
reserve for all disputed claims. One of the disputed claims was
a claim by George Cioe that he was owed 20% of Bess Eaton's stock
worth about $7 million and Gencarelli's counsel indicated that,
if Cioe's claim were resolved, Gencarelli "might...request
dismissal because the purpose of the proceeding would have been
accomplished and that is to get everyone paid who is a court
approved creditor." Id. at 67.

In the meantime, on March 26, 2004, the Superior Court had affirmed the District Court judgments in favor of Mineral Spring and Smith Street but did not enter any judgments, presumably, because Gencarelli's bankruptcy automatically stayed any proceedings against him.  However, on June 24, 2004, after the Bankruptcy court entered a consent order lifting the stay, the Superior Court entered judgment in favor of Smith Street for $257,288.02, which included interest as well as attorney's fees and costs totaling $48,295.50, and in favor of Mineral Spring for $314,059.78, which included interest as well as attorney's fees and costs totaling $48,295.50 and $7,800 in reimbursement for demolition expenses.  Judgment in favor of the appellants also was entered in Gencarelli's declaratory action.[3]

The appellants filed claims in the Bankruptcy Court for the amounts awarded by the Superior Court and for future rental payments for the three year period that the appellants contended would be required to re-lease the properties.  The future rents claimed were $153,667.80 with respect to the Mineral Spring lease and $118,969.26 with respect to the Smith Street lease. Altogether, the total amount claimed by the appellants was $843,984.86.

---

[3]All of the judgments were appealed and, later, affirmed by the Rhode Island Supreme Court.  <u>1800 Smith Street Assocs., LP v. Gencarelli</u>, 888 A.2d 46 (R.I. 2005) (decided December 12, 2005).

The auction sale of Gencarelli's and Bess Eaton's assets was held on April 23, 2004.  Both Hortons and Dunkin Donuts submitted bids and the trustee accepted Hortons' bid of $41,600,000, which was approximately $6 Million more than its original offer and approximately $7 million more than what was needed to satisfy the allowed claims of all of Gencarelli's creditors and Bess Eaton's creditors, as well as the disputed claims filed by the appellants and two other creditors.

Gencarelli sought to increase the $7 million surplus distributable to him[4] by moving to cap the appellants' claims pursuant to Section 502(b)(6) of the Bankruptcy Code which limits the amount that a landlord may recover for future rental payments when a lease is prematurely terminated.  Section 502(b)(6) provides:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that -
>
> > (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds-
> >
> > > (A) the rent reserved by such lease, without acceleration, for the greater of

---

[4] Under 11 U.S.C. § 726, after all allowed unsecured claims have been satisfied and all other obligations have been paid, any remaining property of the estate is distributed to the debtor.

one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of-

(I) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

Stripped of the convoluted verbiage, Section 502(b)(6)(A) limits a claim for rent attributable to the unexpired term of a lease for a period that is the greater of (1) one year or (2) 15% of the unexpired term up to a maximum of 3 years.  It also provides that the relevant period begins to run on the earlier of (1) the date on which the bankruptcy petition is filed; or (2) the date on which the lessor repossessed the property or the lessee surrendered it.  Under Section 502(b)(6)(B), rent already due on the earlier of those two dates may be recovered, in full.

The Bankruptcy Court found Section 502(b)(6) applicable because the appellants' claims clearly were claims for damages resulting from the early termination of leases.  The Bankruptcy Court further found that April 19, 2000 was the trigger date for calculating the period prescribed by Section 506(b)(6) because the stipulations signed at that time amounted to repossessions by

the appellants. Nevertheless, the Bankruptcy Judge expressed some misgivings about Gencarelli's seeming windfall, saying: "I really don't think there is anything the Court can do about this. Whether it would like to or should is another question." Transcript of September 22, 2004 hearing at 39.

Accordingly, the Bankruptcy Court limited the appellants' recovery to rent and reimbursements actually due on April 19, 2000, plus future rent for the one year period beginning on that date. In stating his reasons, the Bankruptcy Judge said only: "I am going to find for the debtor's motion...for the reasons argued by Mr. Ferrucci, [Gencarelli's counsel]. Basically his written argument and his oral arguments here are basically adopted and incorporated by reference into this bench ruling." Id. at 37-38. Consequently, the order entered on November 22, 2004 allowed only $99,573.27 of the $843,984.86 claimed by the appellants.

The appellants argued that, even if Section 502(b)(6) applied, the Bankruptcy Court should have invoked its equitable powers under 11 U.S.C. § 105 to allow their claim in full because capping their claims did not serve Section 502(b)(6)'s purpose of protecting other creditors, inasmuch as there were sufficient funds to pay all creditors.[5] The Bankruptcy Court rejected that

---

[5] 11 U.S.C. § 105 states in pertinent part:

(a)  The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

11

argument, stating that it did not "have a roving commission to do equity," (Transcript of September 22, 2004 hearing at 39) and, later, adding "[i]n light of the clear and unambiguous language of 11 U.S.C. §502(b)(6), this Court will not substitute its judgment for that of the plain reading and intent of that particular statutory provision." November 22, 2004 Order.

On October 28, 2004, Gencarelli filed a motion to disburse $500,000 to himself in order to pay living expenses. Appellants' Exhibit 19.  The appellants objected and moved to dismiss Gencarelli's bankruptcy petition on the ground that it was not filed in good faith because Gencarelli was solvent and his "sole purpose was to use these proceedings to effectuate a sale of [his and Bess Eaton's] assets." Appellants' Exhibit 21 at 9.  During a hearing on those motions[6], the appellants conceded that Gencarelli's bankruptcy petition was not filed specifically to defeat their claims but they argued that Gencarelli lacked good faith because he had no need or intent to reorganize and was

---

title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[6] Although the motion to dismiss was not scheduled for that hearing, appellants' counsel presented arguments relative to both motions and the bankruptcy judge, after confirming that counsel did not request a separate hearing on the motion to dismiss, ruled on both motions.

abusing the bankruptcy process.

The Bankruptcy Court granted Gencarelli's motion to disburse funds, primarily because there were surplus funds of more than $7 million in the bankruptcy estate and only two other disputed claims totaling $300,000 remaining to be resolved before the balance could be distributed to Gencarelli.[7]  The Bankruptcy Court also denied the appellants' motion to dismiss Gencarelli's bankruptcy petition saying only that, "nobody knew what this case was until the bidding was over...there would have been no [Hortons] deal without the filing."  Transcript of November 3, 2004 hearing at 10.  In a later written order, the Bankruptcy Court stated that the motion to dismiss is denied "after considering the papers and pleadings in this matter, as well as arguments and representations of counsel, in open court." November 10, 2004 Order.

Since that time, the Bankruptcy Court has granted motions by Gencarelli to disburse additional sums totaling approximately $5,000,000, but has placed $1 Million in escrow, funds that are sufficient to cover the disallowed balance of the appellants' claim.

### Standard of Review

On appeal, a district court must review a bankruptcy court's

---

[7] The unresolved claims were disputed claims by UPS for $225,000 and Rosemarie Moreau for $75,000.

13

conclusions of law *de novo*, but the bankruptcy court's findings of fact are reviewed under a "clearly erroneous" standard, giving 'due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses.'"   In re Huelbig, 313 B.R. 540, 542 (D.R.I. 2004) (quoting Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997); In re R & R Assocs. of Hampton, 402 F.3d 257, 264 (1st Cir. 2005)(A bankruptcy court's factual findings are considered "clearly erroneous if, after a review of the entire record, [the district court is]'left with the definite and firm conviction that a mistake has been committed.'") (quoting In re Watman, 301 F.3d 3, 8 (1st Cir. 2002)).

A motion to dismiss a Chapter 11 petition is "committed to the sound discretion of the bankruptcy or district court and will [be] review[ed] for abuse of discretion." In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999)(citing Leavitt v. Soto, 171 F.3d 1219 (9th Cir. 1999)); ACLU v. Black Horse Pike Reg'l Bd. of Ed., 84 F.3d 1471, 1476 (3d Cir. 1996).   Thus, the bankruptcy court's decision will be upheld unless it is "clearly erroneous". See In re Chisum, 847 F.2d 597, 600 (9th Cir. 1988), cert. denied 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). A decision by a bankruptcy court regarding whether equitable relief should be granted under Section 105(a) also "is reviewed for an abuse of discretion." Dept. Of Treasury for the

Commonwealth Of Puerto Rico v. Galarza Pagan,   279 B.R. 43, 46

(D.P.R. 2002).

    If the bankruptcy court's findings are considered "too vague

or incomplete to enable meaningful appellate review," a case may

be remanded to the bankruptcy court for further proceedings and

more explicit findings of fact may be appropriate.   In re R & R

Assocs. of Hampton, 402 F.3d at 264.

**Analysis**

I. The Motion to Dismiss - "Bad Faith"

    The threshold question is whether Gencarelli's bankruptcy

petition should be dismissed on the ground that it was not filed

in good faith.  In re Integrated Telecom Express, Inc., 384 F.3d

108, 128 (3d Cir. 2004) (legislative policy underlying Section

502(b)(6) assumes valid bankruptcy and "[t]he question of good

faith is therefore antecedent to the operation of §502(b)(6).").

    The appellants argue that Gencarelli's petition was not

filed in good faith because Gencarelli was solvent at the time

and his only purpose was to use the bankruptcy process in order

to facilitate the sale of Bess Eaton to Tim Hortons.

    Section 1112(b) of the Bankruptcy Code provides that a

bankruptcy petition may be dismissed for "cause."  11 U.S.C.

1112(b).    Section 1112(b)(4) lists sixteen different

circumstances that may establish cause for dismissal.  "Bad

15

faith" is not specifically mentioned, but the list is not exhaustive and it is well established that a lack of "good faith" constitutes cause for dismissal. <u>In re Integrated Telecom Express, Inc.</u>, 384 F.3d at 118 n.3; <u>see</u> <u>In re SGL Carbon Corp</u>, 200 F.3d 154, 160-61 (3d Cir. 1999) (holding that "absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under §1112(b)"); <u>In re Y.J. Sons & Co., Inc.</u>, 212 B.R. 793, 801 (D.N.J. 1997) ("requirement of good faith is an implicit requirement in the filing and maintenance of a Chapter 11 bankruptcy case.").

"Whether the good faith requirement has been satisfied is a 'fact intensive inquiry'" that involves examining "'the totality of facts and circumstances'" and determining whether the petition is consistent with the purposes of the Bankruptcy Act or is "'patently abusive.'" <u>In re Integrated Telecom Express, Inc.</u>, 384 F.3d at 118 (quoting <u>In re SGL Carbon Corp.</u>, 200 F.3d at 162). In order to make that determination, a bankruptcy court must evaluate a "debtor's financial condition, motives, and the local financial realities." <u>Little Creek Dev. Co. v. Commonwealth Mortgage Corp</u>, 779 F.2d 1068, 1072 (5th Cir. 1986).

The purpose of Chapter 11 is to both assist a debtor in making a fresh start by affording protection from the claims of

creditors and to provide an equitable method of dealing with creditors' claims.   See In re Liberate Technologies, 314 B.R. 206, 211 (Bankr. N.D. Cal. 2004).

Generally, a bankruptcy petition does not serve Chapter 11's rehabilitative purpose if the debtor "has no need to rehabilitate or reorganize."   Integrated Telecom Express, Inc., 384 F.3d at 122.   Accordingly, "good faith necessarily requires some degree of financial distress on the part of a debtor."   Id. at 121. However, that does not mean that a debtor must be insolvent in order to file a petition because "even solvent firms can, at times, suffer from financial distress."   Id. at 122 (citing SGL Carbon, 200 F.3d at 163).   Thus, while Chapter 11 petitions by "financially healthy" companies have been consistently dismissed, a debtor is not required to await insolvency before filing a bankruptcy petition.   Liberate Technologies, 314 B.R. at 211. What is required is that the debtor must, at least, "face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future."   SGL Carbon, 200 F.3d at 164.

In any event, Chapter 11 may not be used to frustrate or delay the efforts of creditors to collect legitimate debts. Integrated Telecom Express, 384 F.3d at 129.   Thus, a petition filed by a solvent debtor, solely, for the purpose of invoking

17

Section 502(b)(6) in order to cap a claim for future rent is subject to dismissal for lack of good faith. <u>Id</u>. On the other hand, where a debtor is unable to meet its obligations, the fact that one of the purposes of filing a Chapter 11 petition was to take advantage of Section 506(b)(6) does not, by itself, constitute a lack of good faith. <u>In re PPI Enterprises (U.S.), Inc.</u>, 324 F.3d 197, 211 (3d Cir. 2003).

Filing a Chapter 11 petition in order to liquidate all of the debtor's assets does not constitute bad faith, <u>per se</u>, because Chapter 11 is not limited to the attempted reorganization of a business. Indeed, Chapter 11 expressly contemplates that it may be used "for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4). However, liquidation plans, like reorganization plans, must serve a valid bankruptcy purpose such as "maximizing the value of the <u>debtor's</u> estate." <u>Integrated Telecom Express</u>, 384 F.3d at 120-21 n.4. [emphasis added].

In this case, the appellants rely on <u>Integrated Telecom Express, Inc.</u> and <u>Liberate Technologies</u> as support for their argument that Gencarelli's petition was not filed "in good faith" and should have been dismissed.

In <u>Integrated Telecom Express</u>, a solvent company that had

18

over $100 million in cash and other assets available to pay debts filed a Chapter 11 petition in order to invoke the cap under Section 502(b)(6) after a lessor refused to accept an $8 million settlement of future lease obligations totaling $26 million.  The Third Circuit stated that the good faith requirement "'prevents abuse of the bankruptcy process by debtors whose overriding motive it is to delay creditors without benefitting them in any way . . . .'"  Integrated Telecom Express, 384 F.3d at 119 (citation omitted).   While the Integrated Telecom Court recognized that it was not necessary for a debtor to be insolvent before filing for bankruptcy protection, it found that Integrated's petition was not filed in "good faith" because Chapter 11 proceedings would not maximize Integrated's estate for the benefit of creditors and the petition served solely to limit the claims of long-term lessors.

Liberate Technologies is another case in which a company filing a Chapter 11 petition sought to invoke § 502(b)(6) in order to cap a claim for potential future rent obligations of approximately $45 million.  The Court dismissed the Chapter 11 petition even though the debtor had suffered significant financial losses and was anticipating several law suits because the Court found that the debtor had an unrestricted cash reserve of more than $212 million from which it could pay all of its

19

obligations without the protection of Chapter 11 or the liquidation of any of its assets. <u>Liberate Technologies</u>, 314 B.R. at 209-10.

In this case, as already noted, the appellants concede that Gencarelli's petition was not filed specifically to defeat their claims. However, the extent to which invocation of Section 502(b)(6) and the bankruptcy proceeding, itself, benefitted creditors are factors bearing on whether the petition was filed in "good faith." Here, it appears that Gencarelli's petition benefitted Bess Eaton's creditors by facilitating Tim Hortons' purchase of Bess Eaton's assets which provided the funds to pay Bess Eaton's creditors, in full. It also appears that Gencarelli, himself, benefitted because, as Bess Eaton's sole shareholder and also the owner of real property leased to Bess Eaton, he profited greatly from the sale. However, it is unclear whether Gencarelli's creditors also benefitted or whether his petition served only to limit the appellants' claims.

The record is devoid of any findings that Gencarelli, himself, was experiencing a "degree of financial distress" sufficient to establish that bankruptcy was necessary to rehabilitate him or that bankruptcy provided some benefit to Gencarelli's own creditors. <u>See</u> <u>Integrated Telecom Express</u>, 384 F.3d at 121.

There are vague references in the transcript of the November 3, 2004 hearing to threats of federal receivership and involuntary bankruptcy petitions by creditors.  Transcript of November 3, 2004 hearing at 6.  In addition, it appears that, during the first meeting of creditors, Gencarelli stated that all of his income was derived from rents received from Bess Eaton, and Gencarelli's counsel stated that Gencarelli was in arrears on mortgage payments for several properties he had leased to Bess Eaton because Bess Eaton had not paid the rent on those properties.  Transcript of March 31, 2004 hearing at 28.

On the other hand, it also appears that Gencarelli's assets of $30,788,278.80 exceeded his liabilities of $30,428,937.48 and that those liabilities included his potential liability of $2,112,256.10 on the guarantees given to Bess Eaton's creditors. It further appears that, in the two preceding years, Gencarelli had net income of $1.4 million and $878,000, respectively and, although, at the time of filing, Gencarelli reported net income of $24,150 per month and expenses of $31,558 per month, $10,000 of the expenses consisted of voluntary charitable contributions.

The absence of any findings that Gencarelli was experiencing financial difficulties justifying his bankruptcy petition is understandable because the issue did not arise until Gencarelli sought to cap the appellants' claims.  Until then, there was no

21

reason to address the issue because it was clear that the proceeds of the sale to Horton's would be sufficient to pay both Bess Eaton's creditors and Gencarelli's creditors, in full, and to leave a surplus of several million dollars for distribution to Gencarelli. Gencarelli's "financial difficulties" became an issue only after he sought to cap the amount that the state courts determined were owed to the appellants.

In any event, for whatever the reason, the absence of findings as to whether Gencarelli was in sufficient financial distress to warrant his bankruptcy filing prevents this Court from determining whether the Bankruptcy Court erred in denying the appellants' motion to dismiss and requires that the matter be remanded to the Bankruptcy Court so that it may make the necessary findings.

Ordinarily, this Court would go no further and would await the Bankruptcy Court's findings. However, since the Bankruptcy Court, ultimately, may have to reconsider the amount that the appellants are entitled to recover under Section 502(b)(6), and because resolution of the appeal from the distribution order is not dependent on the Bankruptcy Court's findings with respect to the motion to dismiss, this Court will address the appeals regarding those matters as well, in order to expedite the resolution of this case.

II.   <u>The Section 502(b)(6) Cap</u>

The appellants argue that the Bankruptcy Court erred in capping their claims pursuant to Section 502(b)(6) because: (1) Gencarelli is bound by the position that he took in the state court litigation where he denied the enforceability of the leases and, therefore, he is estopped from invoking the provisions of Section 502(b)(6); (2) even if Section 502(b)(6) applies, the Bankruptcy Court should have exercised its equitable powers under Section 105 to allow the appellants' claims in full; and (3) the Bankruptcy Court erred in calculating the amount to which the appellants are entitled because the April 19, 2000 stipulation did not constitute a surrender or repossession of the premises.

A.   <u>Estoppel</u>

The first argument does not require protracted discussion for two reasons.

First, estoppel does not apply because there is nothing inconsistent about the position Gencarelli took in the state court litigation and his contention that the appellants' claims are subject to Section 502(b)(6).  Gencarelli's position in the state court litigation was that the leases were unenforceable because he terminated them due to his inability to obtain the necessary construction approvals.  In this case, his position is that, even if the appellants' leases are enforceable, the

23

appellants' claims are subject to the limitations imposed by Section 502(b)(6).

Moreover, estoppel does not apply because Gencarelli did not prevail on his defense in the state court. A party invoking judicial estoppel must show that, in a previous case, the party to be estopped took a position that was inconsistent with the position it now takes <u>and</u> that the previous position was adopted by the court hearing that case in rendering its decision. <u>Sheltry v. Unum Life Ins. Co. of America</u>, 247 F. Supp. 2d 169, 175 (D.Conn. 2003) (the party asserting judicial estoppel must show "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner.") (citing <u>Bates v. Long Island R.R.</u>, 997 F.2d 1028, 1038 (2d Cir.), <u>cert. denied</u>, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed. 452 (1993)); <u>see</u>, <u>Faigin v. Kelly</u>, 184 F.3d 67, 82 (1st Cir. 1999) (the party asserting judicial estoppel "must show that the party to be estopped had 'succeeded previously with a position directly inconsistent with the one [he] currently espouses.'")(quoting <u>Lydon v. Boston Sand & Gravel Co.</u>, 175 F.3d 6, 13 (1st Cir. 1999)).

A previously asserted position is not deemed to have been adopted by another court unless the position was asserted

24

successfully.   See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis, 903 F.2d 109, 114 (2d Cir. 1990) (judicial estoppel "applies only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position"); Gens v. Resolution Trust Corp., 112 F.3d 569, 572 (1st Cir. 1997) ("Judicial estoppel is not implicated unless the first forum accepted the legal or factual assertion alleged to be at odds with the position advanced in the current forum")(emphasis in original).

Here, the appellants have not shown that Gencarelli alleged any facts in the state court litigation that are inconsistent with the facts alleged in this case.   Furthermore, it is clear that the state courts rejected Gencarelli's argument that the leases had been terminated.   Therefore, Gencarelli is not estopped from seeking to invoke the cap imposed by Section 502(b)(6).

B.   Applicability of Section 105

The Section 502(b)(6) cap on damages from a debtor's early termination of a long term lease is "designed to compensate the landlord for his loss while not permitting a claim so large as to prevent other general unsecured creditors from recovering a dividend from the estate."   4 Collier on Bankruptcy, § 502.03 [7][a], p. 502-40 (15th ed. rev. 2006) (quoting H.R. Rep. No. 595

25

95th Cong. 1st Sess. 353 (1977)).  <u>See also</u> <u>In re PPI Enterprises</u> <u>(U.S.) Inc.</u>, 324 F.3d at 207 (Congress intended to "limit lease termination claims to prevent landlords from receiving a windfall over other creditors."); <u>In re Atlantic Container Corp.</u>, 133 B.R. 980, 985 (Bankr. N.D. Ill. 1991).

In this case, the cap does not serve that purpose.  The amount received from Hortons was sufficient to pay all creditors, in full, and to leave a surplus of more than $7 million to be distributed to Gencarelli.  Thus, the cap is not necessary to protect other creditors and serves only to prevent the appellants from recovering the full amount due under the state court judgments.  In short, the cap provides a windfall to Gencarelli, a result that does not appear to serve the purpose of Section 502(b)(6) and that seems at odds with the policy underlying the Bankruptcy Act.

The appellants argue that the Bankruptcy Court erred in not correcting this "injustice" by invoking its equitable power under Section 105, which empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the <u>provisions</u> of this title."   11 U.S.C. § 105(a) (emphasis added).

However, while that argument is appealing, it is contrary to the overwhelming weight of authority.  The language of Section

26

105, itself, suggests that a bankruptcy court's exercise of its equitable power must be "tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." 2 Collier on Bankruptcy ¶ 105.01[1], at 105-6 (15th ed. rev. 2006). Indeed, the Supreme Court has held that a bankruptcy court's equity power "can only be exercised within the confines of the Bankruptcy Code" (Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S. Ct. 963, 969, 99 L. Ed. 2d 169 (1988)) and the First Circuit has said "[t]he authority bestowed [under Section 105] may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." In re Jamo, 283 F.3d 392, 403 (1st Cir. 2002). See In re Fesco Plastics Corp., Inc., 996 F.2d 152, 154 (7th Cir. 1993) ("Under this section, a court may exercise its equitable power only as a means to fulfill some specific Code provision."). In re Richards, 994 F.2d 763, 765 (10th Cir. 1993) (a bankruptcy court's equitable powers under Section 105 "may not be exercised in a manner that is inconsistent with the other, more specific provisions of the [Bankruptcy] Code." (quoting In re W. Real Estate Fund, Inc., 922 F.2d 592, 601 (10th Cir. 1990), modified on other grounds)).

Courts have applied these principles in specifically

rejecting the argument that Section 105 authorizes a refusal to apply the Section 502(b)(6) cap when the estate's assets are sufficient to pay all creditors, in full.  <u>See e.g.</u>, <u>In re Federated Dept. Stores, Inc</u>. 131 B.R. 808, 817 (S.D. Ohio 1991) (Nothing in Section 502(b)(6) suggests that an exception exists where all creditors could be paid in full even if the cap were not applied, or where "the debtor is solvent or the court otherwise believes the equities of the case might warrant such a departure."); <u>In re Farley, Inc.</u>, 146 B.R. 739, 748 (Bankr. N.D. Ill., 1992) ("It is irrelevant to analysis under § 502(b)(6) whether [debtor] is solvent or insolvent, or whether other creditors will receive a windfall at [creditor's] expense. Congress presumably weighed those considerations, and the § 502(b)(6) formula is the result of that consideration.").

This Court is aware of only one decision holding the provisions of Section 502(b)(6) inapplicable on the ground that they would result in a windfall to the debtor rather than improved return to other creditors.  <u>See In re Danrik, Ltd.</u>, 92 B.R. 964 (Bankr. N.D. Ga. 1988).  That holding has been expressly rejected by other courts that have addressed the question.  <u>In re Interco Inc.</u>, 137 B.R. 1003, 1006 (Bankr. E.D. Mo. 1992) ("The <u>Danrik</u> decision has not been accepted by courts that have adopted a literal reading of Section 502(b)(6)."); <u>In re Farley, Inc.</u>,

28

146 B.R. at 748 ("Danrik is properly criticized for failing to apply [] the plain language of § 502(b)(6)...").

The appellants' argument that the portion of their claim representing attorneys' fees and interest is not subject to the Section 502(b)(6) cap is literally correct, but does not advance their cause.   Under Section 502(b)(6), a lessor is entitled to recover only for rent and expenses already accrued and, within limits, for future rent.   Attorneys' fees and other expenses claimed as damages for early termination of the lease are not recoverable under the section.   See In re Blatstein, 1997 WL 560119, *16 (E.D. Pa. Aug. 26, 1997) (The Section 502(b)(6) cap "represents the maximum recoverable as a result of the termination of the lease, thereby precluding the payment of attorneys' fees as additional damages.").

In short, the bankruptcy judge was correct in finding that Section 502(b)(6) applied and that Section 105 did not vest him with authority to disregard its literal provisions.

C.   The Amount Allowed

As previously stated, under Section 502(b)(6), the period for which a landlord is permitted to recover reserved (i.e., "future") rent begins to run on the earlier of the date on which (1) the bankruptcy petition is filed, or (2) the "surrender" or "repossession" of the property occurs.

Since the statute does not define when surrender or repossession of leased property occurs, that determination is made pursuant to state law unless state law conflicts with the Bankruptcy Code.  In re Fifth Ave. Jewelers, Inc., 203 B.R. 372, 378 (Bankr. W.D. Pa. 1996) (state law determines surrender of leasehold under Section 502(b)(6)); In re Iron-Oak Supply Corp., 169 B.R. 414, 417-18 (Bank. E.D. Cal. 1994) (leasehold surrender under Section 502(b)(6) is a question of property rights under state law).  See Butner v. United States, 440 U.S. 48, 54-55, 99 S.Ct. 914, 917-18, 59 L.Ed. 2d 136 (1979) (allocation of property rights in the assets of a bankruptcy estate are left to state law).

Under Rhode Island law, a tenant's surrender does not terminate the tenancy until it is accepted by the landlord. Bove v. Transcom Elecs., 353 A.2d 613, 615 (R.I. 1976) (landlord tenant relationship is terminated by the "surrender of the premises by tenant and the acceptance of such surrender by the landlord"). Moreover, the party asserting surrender has the burden of proving it. Peckham v. Brayton, 163 A. 179, 181 (R.I. 1932) ("burden of proving a surrender is upon the party alleging it.").

Determining whether premises have been "surrendered" turns on the "intention of the parties," which is "gathered from their

acts and deeds." <u>Bove</u>, 353 A.2d at 615.   Surrender need not be expressly stated, but "may be implied from circumstances and from the acts of the parties." <u>Id</u>. at 616.   Thus a tenant's unconditional relinquishment of possession coupled with a landlord's resumption of possession or reletting of the premises may constitute a surrender. <u>White v. Berry</u>, 52 A. 682, 683 (R.I. 1902).

However, a landlord's physical repossession of property upon a tenant's voluntary surrender is not sufficient to constitute acceptance where it is clear that the landlord has no intention of giving up his right to future rent. <u>Lott v. Chaffee</u>, 126 A. 559, 560 (R.I. 1924).   Nor is a tenant released from liability for rent accrued at the time of surrender. <u>Id</u>.

Here, the Bankruptcy Court found that surrender occurred when the April 19, 2000 stipulations were executed, but, when the stipulations were signed, it was clear that the appellants had no intention of releasing Gencarelli from his obligations under the leases.   In fact, the appellants had brought suit in state court seeking to recover both accrued and prospective rent payments. Furthermore, both leases expressly provided that, in the event of default, Smith Street and Mineral Spring could terminate the leases, enter the premises and expel the lessee "without prejudice, however, to any right to sue for and recover any Rent" or other sums due under the lease. Leases at ¶ 6.

31

Viewed in this context, it appears that the April 19, 2000 stipulation was executed so that the appellants could attempt to mitigate their damages by leasing the premises to another tenant, something that could not be done unless Gencarelli relinquished any right to possession that he might have under the leases. In light of the ongoing dispute regarding the appellants' claimed entitlement to future rent, it seems clear that the stipulation was not intended to signify an unconditional acceptance of surrender by the appellants. Therefore, the date up to which the appellants were entitled to accrued rent and on which the period for which they were entitled to reserved rent began to run was March 3, 2004, when Gencarelli's bankruptcy petition was filed.

Section 502(b)(6) also provides that a landlord is entitled to recover reserved (i.e., "future") rent for a period equal to the greater of one year or 15% of the unexpired term up to a maximum of three years.

Here, the Bankruptcy Court awarded reserved rent for a one-year period. However, although the issue has not been raised, it would appear that, when Gencarelli's petition was filed on March 3, 2004, the leases had unexpired terms of approximately 15 1/2 years which would have entitled the appellants to more than two years' worth of reserved rent.

Accordingly, this matter also is remanded to the Bankruptcy

Court for the purpose of recalculating both the accrued and reserved rents to which the appellants are entitled under Section 502(b)(6).

III. <u>The Distribution Order</u>

The appellants' objection to the order authorizing the distribution of $2.5 million to Gencarelli so that he could meet certain tax obligations does not require protracted discussion. As already noted, the funds remaining in the bankruptcy estate after the distribution were more than what was needed to satisfy the disputed claims of the three creditors who have not been paid in full.  Therefore, the appellants were not prejudiced by the distribution of the excess funds that eventually would have been distributed to Gencarelli anyway.  <u>See</u> 11 U.S.C. § 726(a)(6) (following payments of creditors' allowed claims, "property of the estate shall be distributed . . . to the debtor.").

<u>Conclusion</u>

For all of the foregoing reasons, it is hereby ORDERED that:

1.   the Bankruptcy Court's November 10, 2004 order denying appellants' motion to dismiss Gencarelli's Chapter 11 petition and its September 22, 2004 order fixing the amount that the appellants are entitled to recover under 11 U.S.C. § 502(b)(6), are VACATED and the case is remanded to the Bankruptcy Court for further proceedings consistent with this Opinion and Order;

2.    the Bankruptcy Court's December 29, 2004, order authorizing an interim distribution to Louis Gencarelli is hereby AFFIRMED.

IT IS SO ORDERED,

_____
Ernest C. Torres, Chief Judge
Date: November 8 , 2006